881 P.2d 11

Royce CLAY, Plaintiff–Petitioner,

and

Shella Snider, Defendant and Third–Party–Plaintiff–Petitioner,

v.

FERRELLGAS, INC., and Gilbert Candelaria, Defendants–Respondents.

Nos. 20701, 20705.

Supreme Court of New Mexico.

Aug. 1, 1994.

Rehearing Denied Sept. 16, 1994.

Pat Chowning, Albuquerque, for Royce Clay.

Felker, Ish, Hatcher, Ritchie, Sullivan & Geer, P.A., Mark L. Ish, Mariana G. Geer, Santa Fe, Shamas & Perrin, Ralph Shamas, Roswell, for Shella Snider.

Modrall, Sperling, Roehl, Harris & Sisk, Douglas R. Vadnais, Albuquerque, Smith, Gill, Fisher & Butts, P.C., David R. Schlee, Charles W. Gordon, Jr., Louis A. Huber, III, Kansas City, MO, for respondents.

William H. Carpenter, Michael B. Browde, Albuquerque, for amicus curiae New Mexico Trial Lawyers Ass'n.

Alice Tomlinson Lorenz, Albuquerque, for amicus curiae New Mexico Defense Lawyers Ass'n.

## OPINION

RANSOM, Justice.

Ferrellgas, Inc., and Gilbert Candelaria appealed to the Court of Appeals from a personal injury judgment entered on a jury verdict awarding compensatory and punitive damages to Royce Clay and Shella Snider. The Court of Appeals affirmed the award of compensatory damages but reversed the award of punitive damages. *Clay v. Ferrellgas, Inc.*, 114 N.M. 333, 838 P.2d 487 (Ct. App.1992). We issued a writ of certiorari to the Court of Appeals to review the reversal of the award of punitive damages. Finding substantial evidence to support the jury verdict, we reverse the Court of Appeals.

■ *Facts.* Although there was conflicting evidence throughout the trial, we will view the evidence in the light most favorable to support the verdict. *Tapia v. Panhandle Steel Erectors Co.*, 78 N.M. 86, 89, 428 P.2d 625, 628 (1967). We draw all reasonable inferences and resolve all disputed facts in favor of the successful party and disregard all evidence and inferences to the contrary. *Id.* Applying this standard, we discern the following facts.

In July 1986 Snider received a car as a gift from her companion, Boyd Clement. Soon thereafter Snider and Clement decided to have the vehicle converted to run on liquid propane as well as on gasoline. Clement took the car to Ferrellgas, which had previously converted several other vehicles to propane use for him. He spoke with office manager Gerald Schell about the arrangements and left the car with Ferrellgas. As part of the deal, Clement purchased a used propane tank from Candelaria, a Ferrellgas employee. Candelaria proceeded to install the tank in the trunk of Snider's car. Candelaria testified that it was his practice to "leak-test" each tank he installed, but he could not recall if he leak-tested this tank. A tank cannot be tested for leaks unless it contains propane, and, to remove all of the propane after testing, the tank must be purged using an inert, nonflammable gas such as nitrogen. None of the Ferrellgas employees purged the tank at any time.

For safety reasons, state law requires that the area inside the vehicle where the tank is mounted be "gastight with respect to driver or passenger compartments and to any space containing ... spark-producing equipment" and the area must be "vented outside the vehicle." Standards for the Storage and Handling of Liquefied Petroleum Gases, N.M. Liquefied Petroleum Gas Bureau, Engine Fuel Sys. Reg. 8–2.7(a)(1), 4 N.M. Reg. 282 (Jan. 27, 1993). Thus, before a tank may be mounted, the installer must place a sealed vapor barrier between the passenger compartment and the enclosure containing the tank (the trunk of the car in this case) and install an outside vent to protect vehicle occupants from the dangers of leaking gas. State law also requires that the tank be placed so that it may be filled from the outside of the vehicle "by permanently installing the remote filling connections ... to the outside of the vehicle." *Id.* Reg. 8–2.7(b). Finally, according to the testimony of Ray Engstrom, the Liquefied Petroleum Gas Bureau Chief for New Mexico, a form detailing

the work done on a vehicle ("Form 6") is to be filed with the state inspector's office when a tank is installed. The purpose of this requirement is to give the inspector an opportunity to double-check the installer's work and make sure it was done correctly. If more than one installer worked on the vehicle, the inspector checks to make sure each part of the work has been done properly.

Ferrellgas admitted that it knew of these safety requirements when it began the conversion of Snider's vehicle. In addition, Candelaria stated that he believed he was to do a complete conversion on Snider's vehicle. Sometime in April, however, Ferrellgas told Clement that completion of the job would be delayed because some parts were not available. After waiting for the parts for a few months, Clement went to pick up the vehicle. At this point Ferrellgas had not installed the vapor barrier between the passenger compartment and the trunk, had not vented the compartment with an outside vent, and had not completed the work necessary so that the tank could be remote-filled. Ferrellgas told Clement that the tank had been installed and informed him that the car would not yet run on propane because the conversion had not been completed. Ferrellgas did not, however, inform Clement that the tank might be dangerous or that the trunk had not been sealed.

Ferrellgas also did not file a Form 6 reporting the installation of the tank. Schell testified that he did not believe a form needed to be filed because the installation had not been completed. Engstrom, however, testified that a form should have been filed. Further, although Schell contended that he had completed over 100 propane tank installations, the state inspector's office could not find a single Form 6 filed by Ferrellgas. Ferrellgas did not offer any excuse for its failure to file the requisite forms.

Snider drove the vehicle for almost four months while waiting for the conversion parts. Because Ferrellgas was unable to obtain the parts, Clement took the car to Gary Roybal to complete the conversion. Roybal completed the adaptation of the car's carburetion system and removed the tank, repainted it, and repositioned it in the same place that Candelaria had installed it. Roybal leak-tested the parts of the conversion system that he had installed but did not test the tank or check to see if a vapor barrier was in place. Roybal testified that he did not check for a vapor barrier because he assumed that Ferrellgas had installed one when it installed the tank. He based this assumption on his belief that the propane tank had some fuel in it when Clement brought in the vehicle.

Although Roybal's work made it possible for the vehicle to be run on propane, Snider did not operate it in that manner because Clement was going to return the vehicle to Ferrellgas so that Ferrellgas could adapt the tank for remote filling. Clement and Snider testified that they did not put propane in the tank at any time. Roybal also testified that he did not put propane in the tank.

On September 20, 1987, Snider and Clay got in to the vehicle and attempted to start it. When Snider turned the key in the ignition, the car exploded and the ensuing burst of flames severely burned both Snider and Clay. The explosion occurred because the spark from the ignition ignited propane gas that had leaked from a faulty valve on the tank and migrated into the passenger compartment of the car. According to expert testimony, the vehicle was unsafe from the time it was picked up from Ferrellgas because there was propane in the tank and because the vehicle lacked a vapor barrier and proper venting.

*Proceedings.* Snider and Clay both brought actions against Ferrellgas and Roybal based on negligence and failure to warn. They each sought compensatory and punitive damages. Prior to trial Snider and Clay settled their claims against Roybal. At the conclusion of the trial the jury determined that Ferrellgas was eighty-nine percent at fault and Roybal was eleven percent at fault. The jury awarded Snider $345,000 in total compensatory damages and awarded Clay $250,000 in total compensatory damages. The jury also determined that the actions of Ferrellgas were reckless and grossly negligent and awarded each woman $375,000 in punitive damages.

*Ferrellgas may be held liable for punitive damages.* The Court of Appeals reversed the award of punitive damages because it did not believe that Ferrellgas had the requisite "culpable mental state" to be held liable for punitive damages.[1] 114 N.M. at 337–38, 838 P.2d at 491–92. The Court's belief appears to be based upon the absence of evidence showing that any single employee knew that the car was being released with propane in the tank and without the installation of a vapor barrier or proper venting. *Id.* at 338, 838 P.2d at 492. The Court also adopted the rule that the nature of conduct required to demonstrate a culpable mental state does not decrease as the risk of danger increases, citing for support *Gleave v. Denver & Rio Grande Western Railroad,* 749 P.2d 660 (Utah Ct.App.1988). 114 N.M. at 338–39, 838 P.2d at 492–93. We disagree with the interpretation of the facts and the rule adopted by the Court of Appeals.

 *–The culpable mental state of a party may be characterized by the risk of danger.* The purpose of punitive damages is to punish a wrongdoer. *Sanchez v. Dale Bellamah Homes of New Mexico, Inc.,* 76 N.M. 526, 531, 417 P.2d 25, 29 (1966). To be liable for punitive damages, a wrongdoer must have some culpable mental state, *McGinnis v. Honeywell, Inc.,* 110 N.M. 1, 9, 791 P.2d 452, 460 (1990), and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level, *Loucks v. Albuquerque Nat'l Bank,* 76 N.M. 735, 747, 418 P.2d 191, 200 (1966). The Court of Appeals recognized these standards and adopted the rule in *Gleave* after inferring the trial court had ruled that "a less culpable mental state would be sufficient if there was a high degree of danger." 114 N.M. at 338, 838 P.2d at 492. We question the Court's inference in light of the trial court's finding in a post-trial hearing that the conduct of Ferrellgas rose to a level of recklessness. We need not address this infer-

ence, however, because we do not find it dispositive.

 The adoption of *Gleave* by the Court of Appeals may be correct insofar as it holds that conduct falling below a level of recklessness would not support an award of punitive damages regardless of the risk of danger. Yet, as the risk of danger increases, the duty of care also increases, *Cross v. City of Clovis,* 107 N.M. 251, 254, 755 P.2d 589, 592 (1988). Thus, as the risk of danger increases, conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state. The circumstances define the conduct; a cavalier attitude toward the lawful management of a dangerous product may raise the wrongdoer's level of conduct to recklessness, whereas a cavalier attitude toward the lawful management of a nondangerous product may be mere negligence. In measuring punitive damages "the enormity and nature of the wrong" must be assessed. *Green Tree Acceptance, Inc. v. Layton,* 108 N.M. 171, 174, 769 P.2d 84, 87 (1989). We believe this is what the trial court had in mind when it indicated that the conduct of Ferrellgas rose to a level of recklessness because of the dangerousness of the product. Because of this, adoption of the rule in *Gleave* is unwarranted and we reverse the Court of Appeals on this point.

*–Substantial evidence supports the award of punitive damages.* The Court of Appeals determined that while there was evidence to support a finding that Ferrellgas was negligent, that negligence did not rise "to the level of culpability required for imposition of punitive damages." 114 N.M. at 338, 838 P.2d at 492. We disagree.

In this case the jury was instructed that for it to find Ferrellgas liable for punitive damages it had to find that the acts of Ferrellgas were reckless *and* grossly negligent. Because the jury presumably followed this instruction, *see* SCRA 1986, 13–2002 (Repl. Pamp.1991) (duty to follow instructions);

---

1. Because the parties stipulated that liability would not be separated between Ferrellgas and its employees, this opinion has made reference to the specific employees only if necessary for clarity; all other references to Ferrellgas are general in nature and are intended to encompass the

knowledge and actions of the employees that constituted the corporation's mental state and participation. The Court of Appeals properly took this same view of the corporate participation issue. 114 N.M. at 337, 838 P.2d at 491.

*Britton v. Boulden,* 87 N.M. 474, 475, 535 P.2d 1325, 1326 (1975) ("It must be presumed that the jury understood and complied with the court's instructions."), it necessarily found that the conduct of Ferrellgas was reckless.[2] For punitive damages, "reckless" is defined as "the intentional doing of an act with utter indifference to the consequences." *See* SCRA 1986, 13–1827 (Repl.Pamp.1991). The Court of Appeals determined that the conduct of Ferrellgas did not demonstrate a culpable mental state because the conduct of no individual employee demonstrated the requisite culpable mental state. The Court did not consider the cumulative effects of their actions.

▪ The Court of Appeals incorrectly compartmentalized the conduct of the Ferrellgas employees. It should have viewed the actions of the employees in the aggregate to determine whether Ferrellgas had the requisite culpable mental state because of the cumulative conduct of the employees. We believe that *Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382, 389 (Ky.1985), illustrates how the "cumulative conduct" of employees may demonstrate corporate recklessness. *Cf. Warford v. Lexington Herald–Leader Co.,* 789 S.W.2d 758, 772 (Ky.1990) (allowing evidence to be "viewed cumulatively" to prove malice in a libel action); *Herron v. Tribune Publishing Co.,* 108 Wash.2d 162, 736 P.2d 249, 256 (1987) (en banc) ("[A]lthough negligence, a failure to investigate, anger or hostility towards that plaintiff, or reliance on sources known to be unreliable would each alone be insufficient proof, when viewed cumulatively and in appropriate circumstances they may establish a clear and convincing inference of actual malice.").

In *Horton,* a family was awarded punitive damages after their house exploded because of the negligence of a gas company. In the early morning hours, the mother of the family had smelled gas and called the gas company to check for leaks. A service representative went to the house, determined that there was a leak outside the house, and concluded after a superficial inspection that closing the chimney damper would stop any gas from entering the house. He called the company to order a repair crew for the leak outside the house. The field supervisor of the repair crew arrived but did not inspect the house, even though he had been told that there was a slight odor of gas inside the house. The supervisor had the authority to order that the gas be turned off and could have evacuated the family, but he took neither of those actions. The house exploded approximately twenty minutes after the field supervisor arrived. The gas leaking from the break in the line outside the house had traveled along the gas lines to the inside of the house. *Id.* at 385–86.

The family presented evidence that for some months prior to the explosion the chief utility inspector for the state had urged the gas company to revise an emergency plan established to direct the handling of gas leak situations. The chief inspector provided the gas company with a model plan based on national standards that included the requirement that gas company personnel use gas detection meters instead of relying on their sense of smell. The court determined that had the gas company adopted the model plan the explosion would have been prevented. *Id.* at 387. The court stated:

[W]hile no one suggests that the gas company or its employees intentionally injured the Hortons, these actions of the employees at the scene must be considered together with the policy and procedures of the gas company in training its employees to handle such emergencies.... Viewed cumulatively the evidence was sufficient

2. We are urged by the New Mexico Defense Lawyers Association to eliminate the term "grossly negligent" because, notwithstanding the confusing inclusion of the word "negligence" in the term, it is synonymous with "reckless". The NMDLA would have us hold that conduct must be reckless to support an award of punitive damages. We need not discuss that issue in this case because we conclude that the conduct of Ferrellgas was reckless and the jury was instructed it had to find both reckless and grossly negligent conduct. Moreover, Ferrellgas conceded in its response to the petitions for certiorari: "Whether 'gross negligence' provides a basis for submission of punitive damages to the jury was not disputed in this case; it unquestionably does." Amicus, of course, "must take the case ... as it stands on appeal and amicus cannot assume the functions of a party." *Nall v. Baca,* 95 N.M. 783, 785–86, 626 P.2d 1280, 1282–83 (1980).

for the jury to conclude that the totality of circumstances indicated "a wanton or reckless disregard for the lives, safety or property of other persons."

*Id.* at 387–88 (quoting standard by which jury was instructed for imposition of punitive damages). Based on this rationale, the court upheld the punitive damages award.

A dissenting justice argued against what he considered to be "the novel theory of adding together several ordinary negligence factors to make out a case of gross negligence." *Id.* at 391 (Stephenson, J., dissenting). We believe, however, that the dissent missed the focus of the majority's rationale.

> Here the acts of the managerial employees in establishing policy and procedures and in failing to do so, in training their personnel to handle situations such as the present one, and in their interaction with the Public Service Commission as indicated by their dealings with [the chief utility inspector] and their correspondence with the Commission, implicated the company as a whole in the charge of wanton or reckless disregard for the safety of others. Here liability for punitive damages is not based on a single, isolated unauthorized and unexpected act of negligence by an employee. The situation is not subject to the charge that the respondent is being punished when completely innocent and liable only vicariously.

*Id.* at 390. This rationale explains why "corporate indifference" in the face of serious risks of danger that should reasonably be foreseen in the handling of explosive gases justifies a finding of "utter indifference to the consequences."

The case at bar, like *Horton*, provides a perfect example of why the acts of the employees should be viewed cumulatively to determine the mental state of a corporation. The Court of Appeals exonerated Ferrellgas from paying punitive damages because neither Candelaria nor Schell knew what the other was doing. 114 N.M. at 338, 838 P.2d at 492. If we follow this analysis, Ferrellgas escapes liability because its employees failed to communicate with each other. The culpa-

ble mental state of the corporation, however, may be inferred from the very fact that one employee could be ignorant of the acts or omissions of other employees with potentially disastrous consequences. In this case Ferrellgas cannot be said to have been an innocent party; through its corporate policy (or lack thereof) it allowed Schell to be unaware of the conduct of Candelaria, and vice-versa, despite the fact that in all probability this ignorance would result in severe harm.

Viewed cumulatively, the evidence in this case supports an award of punitive damages. Ferrellgas employees testified that they knew of the state laws that required them to install a vapor barrier and to properly vent the trunk of the car when they installed the tank. Reading the requirements carefully shows that these steps must be taken *before* the tank is installed. *See* Engine Fuel Sys. Reg. 8–2.7. There is no question that they did not comply with these requirements. Further, in accordance with his usual practice, Candelaria leak-tested the tank when he installed it in the trunk and must have put some propane in it. No Ferrellgas employee, however, purged the tank of propane at any time. Thus, Candelaria knew or should have known that the tank contained propane.

After Candelaria installed the tank, some Ferrellgas employee telephoned Clement and told him to pick up his vehicle because Ferrellgas did not have the necessary parts to complete the conversion. Presumably, this was either Candelaria, who was working on the car, or Schell, who was the office manager and who had arranged the details of the propane conversion with Clement. At any rate, Schell released the vehicle to Clement with the tank installed. When Clement picked up the car, Schell did not tell him that the vapor barrier had not been installed and that the trunk had not been properly vented. Schell also did not check to see if the tank had been filled other than by opening a valve and smelling for gas.[3] He did not ask Candelaria if propane had been placed in the tank nor did he make sure that the tank had been purged. Similarly, Candelaria believed that he was to complete the conversion and

---

**3.** Schell testified at trial that a person could not detect small amounts of propane by smelling the tank. Because Schell was trained and licensed in propane conversions, he may be presumed to

have known that his actions would not suffice to determine if there actually was propane in the tank.

thus knew or should have known that the vehicle had been released. Despite this, he did nothing to retrieve the vehicle or to warn Snider and Clement, even though he knew the risk of harm of releasing a vehicle in that unsafe condition. The net effect of these omissions was that Schell released a vehicle that was dangerously unsafe and in violation of state law.

Finally, there was sufficient evidence to prove that as a corporation Ferrellgas "displayed a cavalier attitude toward[ ] safety regulations." 114 N.M. at 338, 838 P.2d at 492. The fact that Schell had done over 100 conversions without ever filing a Form 6 shows that Ferrellgas did not care to have the state inspector's office double-check the work of its employees.[4] This cavalier attitude must be viewed in light of the foreseeable risk of harm. An expert testified at trial that it would take approximately three ounces of propane (the equivalent of one-quarter of one can of soda) to make the trunk flammable. Further, it would take approximately three cups of propane (the equivalent of two cans of soda) to make the entire passenger compartment flammable. Thus, even residual propane left in a tank creates a potentially volatile and dangerous situation.

In *Horton* the court determined that the negligence of the employees coupled with the fact that the company ignored repeated suggestions to revise investigatory procedures constituted conduct that amounted to a wanton or reckless disregard for the lives, safety, or property of others. In this case Candelaria and Schell negligently allowed an unsafe vehicle to leave their possession. Further, Ferrellgas allowed its employees to violate state law by mounting propane tanks before installing the vapor barrier and proper venting and authorized or participated in Schell's continuing failure to file the proper forms which, had they been filed, probably would have prevented the harm to Snider and Clay. Given the high risk of harm that accompanies the handling of propane gas, the negligence of Schell and Candelaria and regular violation of safety regulations by Ferrellgas amounts to corporate indifference and reckless conduct. *Cf. Horton*, 690 S.W.2d at 387–88.

*Conclusion.* We conclude that the Court of Appeals was incorrect in its adoption of the rule set out by the Utah court in *Gleave*. In addition, we believe that the Court was incorrect in its determination that the evidence did not support the assessment of punitive damages. Thus, we reverse the Court of Appeals and affirm the judgment entered on the jury verdict awarding Clay and Snider punitive damages.

**IT IS SO ORDERED.**

MONTGOMERY, C.J., and FRANCHINI, J., concur.

---

4. The Court of Appeals acknowledged evidence from which the jury could have inferred that Ferrellgas employees displayed a cavalier attitude toward safety regulations, "including routinely failing to file forms designed to ensure that inspectors check gas installations for safety." The Court then held, however, that "the jury was not instructed on this theory of liability and, therefore, it cannot form the basis of a punitive damage award." 114 N.M. at 338, 838 P.2d at 492. The Court cited *Gonzales v. Sansoy*, 103 N.M. 127, 130, 703 P.2d 904, 907 (Ct.App.1984), for the proposition that conduct giving rise to a claim for punitive damages must be the same conduct for which compensatory damages are allowed. *Cf. Sanchez v. Clayton*, 117 N.M. 761, 877 P.2d 567 (1994) (holding that it is the establishment of a *cause of action* for compensatory or nominal damages that is determinative of the right to punitive damages).

We do not consider whether in the statement of a plaintiff's contentions, *see* SCRA 1986, 13–302B (Repl.Pamp.1991), it is necessary to itemize each act or omission that the plaintiff argues and relies upon as constituting negligence that was the proximate cause of injury. Here, the jury properly was instructed in accordance with UJI 13–302B that the plaintiffs had the burden of proving that at least one of their itemized contentions was a proximate cause of the injuries and damages. As long as a jury finds in favor of a plaintiff on one such contention, the plaintiff's burden is satisfied. The jury is not logically precluded from considering evidence of other acts or omissions that were introduced and argued to the jury without objection, as occurred here in relation to the routine practice of ignoring forms. But that is not the point. The matter of ignoring forms constituted evidence, not of a contention of negligence and proximate cause, but of a mental state that was not an essential element of the underlying cause of action on which the jury was instructed.