2003-NMCA-078

70 P.3d 794

**William F. McNEILL, Marilyn Cates, and The Black Trust, Plaintiffs–Appellants,**

**v.**

**RICE ENGINEERING AND OPERATING, INC., Rice Operating Company, Hobbs Salt Water Disposal System whose General Partner is Rice Operating Company, et al., Defendants–Appellees.**

**No. 22,295.**

Court of Appeals of New Mexico.

April 24, 2003.

Certiorari Denied, No. 28,070, June 5, 2003.

James P. Lyle, Law Offices of James P. Lyle, P.C., Turner W. Branch, Branch Law Firm, Albuquerque, NM, Robert Trenchard, Royce Hoskins, Trenchard & Hoskins, L.L.P., Kermit, TX, for Appellants.

Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, NM, Franklin H. McCallum, Midland, TX, John M. Caraway, McCormick, Caraway, Tabor & Madrid, Carlsbad, NM, for Appellees.

## OPINION

BUSTAMANTE, Judge.

{1} Plaintiffs appeal from a partial summary judgment dismissing their claims of trespass and conversion and from the district court's ruling granting Defendants' motion for directed verdict on the issue of punitive damages. We reverse the grant of partial summary judgment and remand the case to the district court for further proceedings on these claims. We affirm the district court's refusal to instruct the jury on punitive damages.

**FACTUAL BACKGROUND**

{2} Plaintiffs William F. McNeill, Marilyn Cates, and the Black Trust are the owners of the "McNeill Ranch," a 110,000–acre property assertedly damaged by salt water disposal undertaken by Defendants over the last forty-plus years. Plaintiffs acquired the ranch by deed in 1995. Defendants are associated with Hobbs Salt Water Disposal System (Hobbs SWDS), which appears to be a partnership or joint venture of Rice Operating Company (Rice Company), and several oil and gas producers. Hobbs SWDS is located near the McNeill Ranch. References to "Rice" in this opinion, unless otherwise stated, refer to Defendants collectively.

{3} On May 29, 1957, the New Mexico Oil Conservation Commission granted Defendants' predecessor, Pan American Petroleum Corporation (Pan American), authority to drill a salt water disposal well on the McNeill Ranch. An area of approximately 2.75 acres, the well became known as Hobbs SWDS Well E–15 (Well E–15). Approximately one month after drilling was approved, Pan American negotiated a "Property Damage Release" (Release) for the site with Will Terry (Terry), Plaintiffs' predecessor and then owner of the McNeill Ranch. Construction and drilling of Well E–15 began after the

Release was executed. About two months later, Rice negotiated a right-of-way with Terry for pipelines that would run "over and through" the ranch. These pipelines would eventually connect Well E–15 to the Hobbs SWDS. Three additional pipeline right-of-ways were later negotiated: one in 1960 with Terry and two in 1977 with his daughters, Plaintiffs' predecessors in interest, Ruth Furneaux and Muriel McNeill.

{4} A massive project constructed over a two-year period, Hobbs SWDS is a gravity-based disposal system comprised of approximately forty-three miles of underground gathering lines. The gathering lines connect to hundreds of producing oil and gas wells, and dispose of large volumes of salt water, a by-product of oil and gas drilling. The system consists of fourteen disposal systems with between one and five or more disposal wells in each system. Well E–15 is one well in one system, although there are other disposal wells on the McNeill Ranch.

{5} After Well E–15 was completed, concrete pipelines were laid on top of the ground on the negotiated right-of-ways. Extending beyond the boundaries of the McNeill Ranch and connecting the main line to Well E–15, the pipelines were later buried. Since the completion of the system in 1960, approximately 99% of the salt water disposed into Well E–15 has come from beyond the boundaries of the McNeill Ranch.

## PROCEDURAL BACKGROUND

{6} Plaintiffs filed a complaint to recover damages against Defendants Rice Engineering and Operating, Inc., Rice Engineering, Inc., and Rice Company, along with a jury demand in October 1998. A second amended complaint added the remaining Defendants. Plaintiffs' claims are based on two types of alleged wrongful conduct: (1) Rice's unauthorized use of Well E–15 for the disposal of salt water produced outside the McNeill Ranch, and (2) Rice's alleged negligence in allowing the salt water disposal system to leak onto Plaintiffs' land.

{7} Plaintiffs alleged that in 1995, they discovered Rice had been injecting off-site salt water into Well E–15 since 1958, and this disposal was without authorization or com-

pensation, thereby constituting a continuing trespass. Plaintiffs further claimed that since 1958, Rice had converted the money which participants in the salt water disposal system paid Rice. Plaintiffs initially alleged Rice had converted the use of the well and the money but later conceded there is no claim for the conversion of real property. *Bowman v. Butler,* 98 N.M. 357, 360, 648 P.2d 815, 818 (Ct.App.1982) (defining conversion as "the unlawful exercise of dominion and control over *personal property*") (emphasis added); *see Harrell v. Hayes,* 1998–NMCA–122, ¶ 16, 125 N.M. 814, 965 P.2d 933. Hence, the claim in this appeal refers to the conversion of money due Plaintiffs for the disposal of off-site salt water into Well E–15.

{8} The complaint also charged Rice with negligence in allowing a salt water spill from the system on the McNeill Ranch, at a point referred to as the "I–9 spill site." Compensatory and punitive damages were sought on the trespass, conversion, and negligence claims.

{9} Prior to trial, Rice filed a Motion for Partial Summary Judgment to dismiss the trespass and conversion claims on several grounds, including that (1) Rice had obtained a prescriptive easement or easement by implication for its disposal into Well E–15, (2) the Release authorized Rice to dispose off-site salt water into Well E–15, (3) Plaintiffs' claims were limited to the time during which they were in actual possession of the ranch, and (4) a statute of limitations theory. The district court granted summary judgment in favor of Rice on the limited ground that the Release unambiguously granted Rice the right to dispose of off-site salt water produced into Well E–15. The district court's summary judgment applied equally to the conversion claim as to the trespass claim, and Rice defends the judgment solely on the ground relied upon by the district court-that the Release was unambiguous and allowed the disposal of salt water. We limit our opinion to the issues raised by the parties and ruled on by the district court, and nothing herein is intended to express any opinion on the validity or invalidity of the conversion

claim or the defenses raised by Rice in its motion other than release.

{10} The case proceeded to trial by jury on the negligence claim. The district court directed a verdict in Rice's favor on Plaintiffs' punitive damages claim. The jury awarded Plaintiffs $70,000 for compensatory damages.

## DISCUSSION

### Partial Summary Judgment on Claims of Trespass and Conversion

{11} The issue before this Court is whether there exists a genuine issue of disputed fact as to the meaning of the Release. Before we address the merits of that issue, we dispose of Rice's claim of lack of preservation. Rice claimed that Plaintiffs' theory about the Release had broadened on appeal to deny the right to dispose of any salt water into the well. Our understanding of Plaintiffs' theory, however, is that the Release may have authorized disposal of salt water produced on the ranch, but did not authorize disposal of salt water produced off-site. We next turn to the merits.

{12} An appeal from a grant of summary judgment presents a question of law that is reviewed de novo. *Bartlett v. Mirabal*, 2000–NMCA–036, ¶ 4, 128 N.M. 830, 999 P.2d 1062. Summary judgment is a drastic remedy that courts must apply with caution. *Rummel v. St. Paul Surplus Lines Ins. Co.*, 1997–NMSC–042, ¶ 9, 123 N.M. 767, 945 P.2d 985. Consequently, a reviewing court must "examine the whole record for any evidence that places a genuine issue of material fact in dispute, and we view the facts in a light most favorable to the party opposing the motion and draw all reasonable inferences in support of a trial on the merits." *Handmaker v. Henney*, 1999–NMSC–043, ¶ 18, 128 N.M. 328, 992 P.2d 879 (internal quotation marks and citation omitted). In the end, the question raised on a motion for summary judgment is whether "from the facts presented, [only] one reasonable conclusion can be drawn, ... [or] if a fair minded factfinder ... could return a verdict for [the nonmovant]." *Goradia v. Hahn Co.*, 111 N.M. 779, 782, 810 P.2d 798, 801 (1991) (internal quotation marks and citation omitted). Summary judgment should be denied where the facts

support "equally logical but conflicting inferences." *Johnston v. Sunwest Bank*, 116 N.M. 422, 425, 863 P.2d 1043, 1046 (1993).

{13} Here, the district court granted summary judgment on the ground that the Release was unambiguous in its terms and barred Plaintiffs' claims. Releases are contractual in nature and thus are governed by traditional principles of contract law. *Ratzlaff v. Seven Bar Flying Serv., Inc.*, 98 N.M. 159, 162, 646 P.2d 586, 589 (Ct.App. 1982); *see Sitterly v. Matthews*, 2000–NMCA–037, ¶ 15, 129 N.M. 134, 2 P.3d 871. "Whether a contractual provision is ambiguous is a question of law, which we review de novo." *Id.; see Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781–82, 845 P.2d 1232, 1235–36 (1993). The standard to be applied in determining whether a contract is subject to equally logical but conflicting interpretations is the same standard applied in a motion for summary judgment. "If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law," *id.*, and summary judgment would be proper. On the other hand, "[i]f the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists," and summary judgment would not be proper. *Id.* Rather, the jury must resolve any factual issues presented by the ambiguity. *Id.* at 782, 845 P.2d at 1236. In resolving ambiguity, extrinsic evidence may be admitted to aid the jury in interpreting the intent of the parties. *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991). The jury must then decide if the evidence presented supports one interpretation rather than the other. *See* UJI 13–825 NMRA 2003. If, after hearing all of the evidence, the jury is unable to resolve the ambiguity and determine the intent of the parties, the contract may fail altogether. *See* Restatement (Second) of Contracts § 201 cmt. d (1981).

{14} For purposes of clarification, we note the district court may consider the circumstances surrounding the making of the contract and of any relevant usage of trade,

course of dealing, and course of performance in making its threshold determination of whether the contract terms are ambiguous. *C.R. Anthony Co.*, 112 N.M. at 508–09, 817 P.2d at 242–43. Here, the district court appears to have based its decision on the face of the Release, rather than the evidence submitted by the parties in support of their motions for summary judgment and responses. Hence, we consider only whether the court erred in finding the document unambiguous on its face. We leave the evaluation of the admissible evidence to the jury on remand.

{15} The district court held that:

[T]he Surface Damages Agreement between Mr. Will Terry and Pan American is unambiguous in its terms and it is clearly assignable and grants to said Defendants the right to use, occupy, and damage Plaintiff's [sic] property and estate consistent with the construction and operation of one or more salt water disposal wells.

We disagree that the Release is unambiguous. The Release provides as follows: [1]

### PROPERTY DAMAGE RELEASE

WHEREAS, the undersigned (referred to hereinafter in the singular whether one or more) is asserting a claim against Pan American Petroleum Corporation arising out of damages to certain property, to-wit: *Damage to land surface incurred for road construction and drilling operations, including permanent use of land for the roadway and a certain tract specifically described below.*

which damages resulted from certain occurrences or operations ~~alleged~~ *expected* to ~~have~~ *take*n place on the following described tract or parcel of land:....

said ~~alleged~~ occurrences or operations being more particularly described as follows: *Drilling, equipping and operating one or more salt water disposal wells and/or an oil well if commercial production is encountered on the above described lands together with related facilities excluding, however, right-of-ways for salt water gath-*

*ering system beyond the boundaries of this tract.*

AND, WHEREAS, there exists a bona fide dispute and difference between the undersigned and Pan American Petroleum Corporation as to the validity of said claim, and although denying liability therefor Pan American Petroleum Corporation is willing to purchase its peace.

NOW, THEREFORE, for and in consideration of the sum of *$500.00,* cash in hand paid by Pan American Petroleum Corporation, the receipt and sufficiency of which is hereby acknowledged and confessed, the undersigned does hereby release the said Pan American Petroleum Corporation, its successors and assigns, of and from any and all causes of action, damages, liabilities, expenses and costs whatsoever arising by reason of the said occurrences or operations.

{16} Rice reads the document to unambiguously release "any and all" damages arising from the operation of a salt water disposal well, excluding any damages caused by the right-of-ways for the salt water gathering system that extends beyond the boundaries of the land. Rice reasons that the reference to surface damages in the first paragraph is merely a recital clause that explains how the Release came into existence and does not form any part of the agreement. To Rice, the core of the Release is the "release clause," which expressly releases Rice from "*any and all ... damages ... whatsoever*" arising from "said occurrences or operations," including the operation of a salt water disposal well. By inserting, "*expected to take place,*" Rice argues the parties contemplated that the Release would include a release for any and all future damages arising from the operation of a salt water disposal well. Because the Release does not limit the source of salt water to be disposed, Rice argues, the Release allows the disposal of salt water produced off-site into Well E–15.

{17} Rice construes the exclusion clause—excluding "right-of-ways for salt water gath-

---

1. We have italicized and underscored the provisions of the Release that were typed in by the parties on what appears to be a printed form document. The lines through certain language are modifications made by the parties to the form.

ering system beyond the boundaries of this tract"—to mean that although Terry released all damages for certain "occurrences or operations," he retained the right to seek damages arising from such right-of-ways. Rice argues that exclusion of the easements is proof Terry knew Pan American would be importing salt water into the well from lands other than Plaintiffs'.

{18} Plaintiffs counter that the Release is a release paying $500 for *damages to land surface* incurred during the original construction of Well E–15 and the infrastructures and facilities needed to complete that construction. The damages released also include surface damages associated with the drilling and operation of oil wells and one or more disposal wells needed to accompany the oil wells on the McNeill Ranch, in the event oil production was encountered on the ranch.

{19} In construing the Release, Plaintiffs first note that the document is entitled "Property Damage Release," which to them indicates it is not a "salt water disposal agreement." In their view, the first paragraph defines the scope of the claims being released—"[d]amage to land surface incurred for road construction and drilling operations." In Plaintiffs' view, the "any and all" language conflicts with the definition clause, but is more logically tied to the surface damage clause and should be read as "any and all claims for damages to [land] surface" arising by reason of drilling, equipping, and operating one or more salt water disposal wells.

{20} Plaintiffs next turn to the second and third paragraphs of the Release. They argue that the language "if commercial production is encountered on the described lands" demonstrates an intent to allow those things needed to achieve production on the McNeill Ranch—drilling, equipping, and operating one or more disposal wells and/or an oil well—and release the damage caused to the land's surface as a result. Plaintiffs argue that the exclusion of right-of-ways for the salt water disposal system from beyond the boundaries is consistent with the surface damage clause, and indicates the parties did not agree to the disposal of off-site salt water into Well E–15.

{21} After reviewing the Release and the parties' interpretations, we find the Release

is susceptible to two reasonable but inconsistent interpretations on its face. Inasmuch as reasonable jurors could find either interpretation correct, the Release is ambiguous on its face. Accordingly, we hold it was error for the district court to dismiss the trespass and conversion claims, at the summary judgment stage, on the basis of the Release.

{22} First, we observe that the Release was drafted on what appears to be a general release form which was designed to accomplish one objective, but was modified by the parties to accomplish another. Without the changes, the document appears to be nothing more than a general release form for personal injury or property damage. *See* 6 William J. Flittie, Summers Oil and Gas § 1418 (West 1967) (General Form Release in Full). With the changes, the document creates ambiguity as to the parties' intent. *Cf. id.* § 1173 (Lease for Salt Water Disposal).

{23} Prior to its modification, the form was designed to cover existing damages. It was modified to cover future damages, yet there is retroactive language throughout. For example, paragraph two was changed to read prospectively: "occurrences or operations ~~alleged~~ expected to ~~have~~ taken place." But the tense is unchanged in: (1) paragraph one, which includes the language "is asserting a claim . . . arising out of damages"; (2) paragraph two, which begins "[W]hich damages resulted from"; and (3) paragraph four, which relates that "there exists a bona fide dispute . . . as to the validity of said claim." Even assuming the parties intended the modification to release future damages, it would not be unreasonable for a jury to conclude the waiver related to surface damages as Plaintiffs assert, and did not include unlimited off-site salt water disposal.

{24} Adding to the confusion, the "surface damage" language in the recital clause was added by the parties, yet the broader waiver of "any and all damages" appears to be form language. We do not believe it is proper to discount the recital clause and ignore the reference to surface damages inserted by the parties. "Although their proper role in the interpretation of the main body of the contract has sometimes been unclear, it is plain

that [recitals] are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the contract." *See* 2 E. Allan Farnsworth, Contracts § 7.10, at 513–14 (2d ed.1990) (footnote omitted). We find this particularly persuasive in this case in view of the other apparently inconsistent modifications to the form described above. Viewed in this light, reasonable jurors could find the Release to read as Plaintiffs urge, to wit: a release for any and all damages to land surface expected to take place as a result of drilling, equipping, and operating one or more salt water disposal wells and/or oil well if commercial production is encountered on-site.

{25} Second, the Release is indefinite and unclear as to scope and coverage. *See Mark V, Inc.*, 114 N.M. at 781, 845 P.2d at 1235 ("An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity."). The Release does not expressly authorize salt water disposal, and any implied authorization would apparently be unlimited in scope and time. Did the parties "expect" that unlimited amounts of salt water would be injected into the well forever? Does the Release allow disposal from any source or is it limited to salt water produced on the McNeill Ranch? *See Farragut v. Massey*, 612 So.2d 325, 328–30 (Miss.1992) (finding release ambiguous partly because it did not resolve crucial question whether it authorized lessees to dispose of salt water from third parties holding leases on adjoining lands).

{26} Our research indicates that where oil production is encountered on a person's land there may be an implied authorization to dispose of salt water in order for the production of oil and gas on that person's land to be accomplished. *See Colburn v. Parker & Parsley Dev. Co.*, 17 Kan.App.2d 638, 842 P.2d 321, 327 (1992) (holding oil and gas lease included implied covenant to dispose of salt water produced during operations on leased premises without additional compensation to lessor to accomplish the production of oil and gas on leased premises); *see also Leger v. Petroleum Eng'rs, Inc.*, 499 So.2d 953, 955–56 (La.Ct.App.1986) (concluding although

lease merely referenced surface uses, there was implied right to dispose of waste water obtained from production of oil wells located on property where such use caused no damage to the property and was necessary to accomplish overall purpose of production from the leased property). However, the rationale for that rule does not apply to the disposal of salt water produced on other property. *Gill v. McCollum*, 19 Ill.App.3d 402, 311 N.E.2d 741, 743 (1974) (holding injection from other leases into a well on leased premises must have some relation to the primary purpose of obtaining production on lessee's property); 4 Eugene Kuntz, A Treatise on the Law of Oil and Gas, § 50.4(c) (1990) [hereinafter Kuntz] (citing *Gill* with approval); *see also Farragut*, 612 So.2d at 328 (finding lease permitted importation of salt water from adjoining properties when lessee's operations extended to those properties and benefitted from the disposal, but lease did not authorize lessees to accept salt water from third parties). Although the facts of these cases are not precisely on point, the principle is consistent with Plaintiffs' interpretation of the Release.

{27} Third, if the Release was intended to substitute as a disposal agreement as Rice urges, a jury could be persuaded that there should be terms indicating that was the agreement. *See Pope v. The Gap, Inc.*, 1998–NMCA–103, ¶ 11, 125 N.M. 376, 961 P.2d 1283 (recognizing the fundamental principle that for a contract to be binding there must be "objective manifestation of mutual assent by the parties to the material terms of the contract"); *see also Farragut*, 612 So.2d at 330 (finding plaintiff had no reason to anticipate the disposal of off-site salt water given the circumstances at time release was executed and "particularly since the lease agreement did not provide for it"); *Hyder v. Brenton*, 93 N.M. 378, 384, 600 P.2d 830, 836 (Ct.App.1979) (Walters, J., dissenting in part, concurring in part) (" 'Vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.' ") (quoting 1 A. Corbin, Contracts 615 § 95, at 394 (1963)); *Thompson v. Thompson*, 391 N.W.2d 608, 611 (N.D.1986) (in drafting contract, purchas-

er who intends to purchase existing salt water disposal well must do so explicitly so seller and purchaser contract with regard to the same thing or run the risk that ambiguity will be construed against him). Although a written contract need not detail every term, essential terms must be expressly provided or necessarily implied by construction for a court to find the contract unambiguous on its face. *See C.R. Anthony Co.*, 112 N.M. at 507, 817 P.2d at 241. A jury could find it significant that the Release does not mention the disposal of off-site salt water, and it seems to us that the district court made an unwarranted leap, without more, in construing the Release as unambiguously granting such a broad right, as did the court in *Farragut* on materially similar facts.

{28} In light of the foregoing, summary judgment on the basis of the Release was error. Accordingly, we remand the case for further proceedings.

### Directed Verdict Dismissing Punitive Damages Claim

{29} Plaintiffs' second claim on appeal is that the district court erred by directing a verdict against them on the issue of punitive damages. Plaintiffs' claim arose from a leak known as the I–9 spill site. The I–9 spill occurred when a steel nipple inside a junction box in the pipeline corroded. The spill was discovered by Rice in June 1998. Although it is unknown how long the pipe had been leaking by that time, Rice notified Plaintiffs immediately and repaired the pipe within three to four days.

{30} The only other major leak in the Hobbs system during its forty years of operation was referred to as the "West County Road leak" (1993 leak). The 1993 leak was caused when a worker ran a backhoe or grader into the pipe during the construction of a by-pass in 1988. The leak was not discovered until 1993, and was still being remediated at the time of trial in 2001. Rice apparently had nothing to do with the 1993 leak.

{31} "A directed verdict is a drastic measure that is generally disfavored inasmuch as it may interfere with the jury function and intrude on a litigant's right to a trial by jury." *Torres v. El Paso Elec. Co.*, 1999–NMSC–029, ¶ 26, 127 N.M. 729, 987 P.2d 386; *see Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 729, 749 P.2d 1105, 1108 (1988). Hence, a "directed verdict is appropriate only when there are no true issues of fact to be presented to a jury," and "it is clear that the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Torres*, 1999–NMSC–029, ¶ 26, 127 N.M. 729, 987 P.2d 386 (internal quotation marks and citations omitted). In reviewing whether a directed verdict was appropriate, we consider all evidence that has been properly admitted at trial, as well as all reasonable inferences deducible therefrom, resolving any conflicts or contradictions in the evidence in a light most favorable to the party resisting the motion. *Id.; see Couch v. Astec Indus., Inc.*, 2002–NMCA–084, ¶ 57, 132 N.M. 631, 53 P.3d 398. Accordingly, where a court directs a verdict at the end of a plaintiff's case, the district court, as well as the reviewing court, may consider only evidence that has been admitted in the plaintiff's case-in-chief and any evidence a defendant introduced through cross-examination. *Torres*, 1999–NMSC–029, ¶ 26, 127 N.M. 729, 987 P.2d 386; *Delta Automatic Sys., Inc. v. Bingham*, 1999–NMCA–029, ¶¶ 20–21, 126 N.M. 717, 974 P.2d 1174. We review de novo the question whether sufficient evidence exists as a matter of law to justify a verdict in one party's favor. *Couch*, 2002–NMCA–084, ¶ 57, 132 N.M. 631, 53 P.3d 398.

{32} To survive a motion for directed verdict on a punitive damages issue, Plaintiffs had to submit evidence from which a jury could find that Rice acted with a culpable mental state, or evil motive, that rose to a level of conduct that was willful, wanton, malicious, reckless, oppressive, or fraudulent. *Torres*, 1999–NMSC–029, ¶ 27, 127 N.M. 729, 987 P.2d 386; *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269, 881 P.2d 11, 14 (1994); *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 210, 880 P.2d 300, 307 (1994). "A mental state sufficient to support an award of punitive damages will exist when

the defendant acts with 'reckless disregard' for the rights of the plaintiff-i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless 'utterly fail[s] to exercise care' to avoid the harm." *Id.* at 211, 880 P.2d at 308 (alteration in original). In reviewing the question whether evidence is sufficient to establish a culpable mental state, we must bear in mind that the limited purpose of punitive damages is " 'punish[ing] a wrongdoer,' and deterring future tortious conduct." *Torres,* 1999–NMSC–029, ¶ 30, 127 N.M. 729, 987 P.2d 386 (alteration in original) (citation omitted); *Clay,* 118 N.M. at 269, 881 P.2d at 14; *Paiz,* 118 N.M. at 210, 880 P.2d at 307.

{33} Plaintiffs' theory was that Rice acted with reckless and wanton disregard in failing to adopt an effective leak detection system, despite the damage caused by the 1993 leak. Plaintiffs assert the following evidence adduced at trial rises to the requisite level of recklessness:

1.  The pipeline ... is part of a 40 year old salt water disposal system ... [that] carr[ies] waste fluid from oil production which can be described as "ocean water with an oil spill on it."

2.  Because this is a gravity flow system, the lines have to be buried.

3.  Gravity first pulls any leaks down (toward the water table). [Rice] had no method to detect leaks other than actually seeing the leaks [after] one had finally seeped back up to the surface.

4.  [Rice] knew the pipeline had suffered at least one previous major leak. Indeed, [Rice has] had knowledge for many years prior to the [I–9 spill] that the pipeline had leaked.

5.  [Rice] didn't have any formal program for "walking the lines" until 1999.

6.  [Rice] knew the inspection method that it utilized could not detect substantial leaks within the pipeline until such leaks had likely created a major pollution problem. Indeed, ... a major leak was detected in 1993 which had occurred several years previously. The damage from that old leak

was still being remediated ... in 2001.

7.  [Rice does not] know how long ... [I–9 spill] existed.

8.  The problems with this design were obvious to persons who had oilfield experience, and to those who had no oil field experience.

9.  A prudent operator would not use an underground system with steel junctions that corrode because of the salt water they carry, and which could not be pressure tested to discover leaks before contaminants entered the water table or ... had created an environmental disaster.

10. [Rice], for years, consciously disregarded and acted recklessly with respect to the known risk and ... likelihood, that major leaks would go undetected until substantial environmental damage had occurred.

11. At the time of trial in 2001, [Rice] had no plan to change its operation of the system or make any change that would prevent major leaks from going undetected until they bubbled up to the surface.

12. Plaintiffs' expert, Mr. Ron Britton, was of the opinion that there will continue to be major leaks in this system if no changes are made.

To Plaintiffs, the cumulation of the evidence showed: Rice knew the pipeline had leaked for many years and knew their inspection method could not detect leaks until significant pollution had already occurred. Rice had replaced similar pipes in other underground systems with pipe that does not corrode and was capable of being pressure tested for leaks. Despite this knowledge and ability to correct the problem, Rice continued to operate the forty-year-old pipeline without an effective method of leak detection and caused substantial damage to Plaintiffs' land.

{34} The district court concluded Plaintiffs had not introduced evidence sufficient to establish reckless or wanton conduct. Specifically, the district court found (1) the older leak on the system, caused by a backhoe during the construction of a by-pass, was not

sufficient notice to Rice of the potential for future leaks from corrosion in the pipelines; (2) despite the fact that Plaintiffs' expert testified Rice was reckless to build a salt water system with steel plugs in its junction boxes because of its corrosive nature, that system had lasted forty years; and (3) despite the absence of a "formal written policy," Rice had an unwritten policy to walk the lines to inspect the pipelines for leaks. We agree with the district court that Rice's conduct did not rise to the requisite level of recklessness.

{35} First, we note that Plaintiffs' contention that Rice had replaced similar pipes in other systems and therefore had the ability to correct the problem was not in evidence at the close of Plaintiffs' case. Rather, it was elicited by Plaintiffs on cross-examination of Rice's witness during the defense case. Hence, the district court did not consider that evidence in reaching its decision to grant a directed verdict. Plaintiffs never requested the district court to reconsider the directed verdict in light of this evidence. As such, Plaintiffs failed to preserve this particular argument and this Court may not now consider the evidence on appeal. *See* Rule 12–216(A) NMRA 2003; *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.,* 1999–NMSC–006, ¶ 22, 127 N.M. 1, 976 P.2d 1; *State v. Garcia,* 84 N.M. 519, 521, 505 P.2d 862, 864 (Ct.App.1972) (holding that when potential error becomes apparent during trial, motions must be called to trial court's attention at that time and party cannot rely on earlier motion).

{36} Second, even though Hobbs SWDS was a forty-year-old system of buried pipelines with steel junctions that had no method of leak detection other than visual inspection and it was likely that some part would corrode eventually, our precedent together with the undisputed facts do not support a finding that Rice's design and operation of that system was reckless.

{37} Plaintiffs primarily relied on Rice's knowledge of the 1993 leak to establish knowledge that such leaks would go undetected until they had caused substantial damage. In Plaintiffs' view, the relevant similarity between the 1993 leak and the I–9

spill was not their cause but the fact that both leaks went undetected for some time because the system was inadequate to detect leaks. Although prior similar incidents may support a finding of punitive damages by establishing "knowledge, attitude, or response to dangers [Rice] knew or should have known about prior to Plaintiff[s'] injury," *Enriquez v. Cochran,* 1998–NMCA–157, ¶ 126, 126 N.M. 196, 967 P.2d 1136, we do not believe Rice's knowledge of the risk that leaks would go undetected was sufficient to constitute recklessness under the facts of this case. In reviewing Plaintiffs' evidence, we bear in mind that Rice's "conduct should be viewed in light of the risks of danger arising from the activity." *Id.* ¶ 121. "[A]s the risk of danger increases, the duty of care also increases ... [and] conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state." *Clay,* 118 N.M. at 269, 881 P.2d at 14 (citation omitted); *Enriquez,* 1998–NMCA–157, ¶ 121, 126 N.M. 196, 967 P.2d 1136. In other words, "[t]he circumstances define the conduct .... [and] 'the enormity and nature of the wrong' must be assessed." *Clay,* 118 N.M. at 269, 881 P.2d at 14 (citation omitted). For example, where there is a risk of personal injury from certain conduct, such as when the conduct involves a dangerous product, evidence that the defendants breached a duty of care is more likely to be found reckless.

{38} It is undisputed that Plaintiffs' land was substantially damaged by Rice's conduct. Although Rice knew from the 1993 leak that such a leak may go undetected for years, the risk involved was an economic risk to property, for which the jury compensated Plaintiffs. While we assume that waste water could be dangerous to persons or animals if ingested, there was no evidence of such an injury in the instant case.

{39} Third, there was substantial evidence arguing against any finding of recklessness. Rice established that the salt water disposal system never violated industry standards or government regulations, either at the time of construction or at the time of trial. There was also evidence that the system had operated for over forty years with only two major leaks. The first and only leak which oc-

curred as a result of the system's design and age was the I–9 spill, which was the subject of Plaintiffs' claim. There was evidence Rice detected the I–9 spill, immediately reported it to Plaintiffs, and repaired it within three to four days. While Rice could not tell how long the leak had existed, Plaintiffs offered no evidence that it was a long-term leak like the 1993 leak. Moreover, while Plaintiffs are correct that Rice had no formal policy to "walk the lines," there was evidence Rice did have an unwritten, informal policy to "walk the lines" to inspect the pipelines for leaks. In fact, since it was Rice who discovered the I–9 spill, it was apparently this procedure that resulted in discovery of the leak.

{40} We note Plaintiffs did not offer any evidence of what Rice could have done differently to detect leaks, short of replacing the entire forty-three mile system. We know of no precedent, and Plaintiffs cite none, which requires companies to take every means available, no matter how costly or how feasible to avoid any potential economic injury, even if it knows or has reason to know such may be the consequence. *Cf. Constr. Contracting & Mgmt., Inc. v. McConnell*, 112 N.M. 371, 375–76, 815 P.2d 1161, 1165–66 (1991) (noting that even an intentional breach of contract may not serve as the basis for an award of punitive damages where non-breaching party is fully compensated and inability to perform the contract without substantial financial loss is legitimate business reason). We believe the negligence regime provides an adequate remedy in these circumstances.

{41} Our conclusion is not shaken by Plaintiffs' expert's opinion that Rice was engaged in reckless conduct because there was a reasonable probability major spills would occur in the future if operations remained the same. The opinion is akin to a legal conclusion and adds little if anything to Plaintiffs' position, especially in light of the facts that the system has been operating for over forty years without any previous leaks caused by the system's old age and that the I–9 spill was the first leak caused by corrosion. We agree with the district court—we find nothing reckless about the design or operation of

such a system, even if Rice knew it would eventually wear out.

## CONCLUSION

{42} We reverse the summary judgment dismissing Plaintiffs' trespass and conversion claims because we find that reasonable minds could attach different meanings to the Release on its face. Accordingly, we remand the case on the issue of these claims for further proceedings.

{43} We affirm the district court's decision to direct a verdict in Rice's favor on the issue of punitive damages.

{44} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and JONATHAN B. SUTIN, Judges.