2005-NMCA-082

115 P.3d 799

Roddie CHAVARRIA and Norma Castaneda, Plaintiffs–Appellees/Cross–Appellants,

v.

FLEETWOOD RETAIL CORPORATION OF NEW MEXICO, Defendant–Appellant/Cross–Appellee.

Nos. 23,874, 24,444.

Court of Appeals of New Mexico.

May 6, 2005.

Certiorari Granted, No. 29,246, June 27, 2005.

Kyle W. Gesswein, Las Cruces, NM, Richard N. Feferman, Janet Santillanes, Albuquerque, NM, for Appellees/Cross-Appellants.

Edward Ricco, Jeffrey M. Croasdell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellant/Cross-Appellee.

## OPINION

KENNEDY, Judge.

{1} Defendant appeals from a judgment awarding compensatory and punitive damages to Plaintiffs on their claims arising from the purchase of a mobile home, and from an order awarding attorney fees to Plaintiffs. Defendant challenges the trial court's (1) award of compensatory damages to Plaintiffs for fraud, conversion, and violation of the Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -24 (1967, as amended through 2003); (2) award of punitive damages; (3) dismissal of Defendant's counterclaim without prejudice; and (4) award of attorney fees to Plaintiffs under the UPA and the Insurance Code. On cross-appeal Plaintiffs challenge the trial court's reduction of punitive damages and refusal to dismiss Defendant's counterclaim with prejudice. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. In light of our disposition, we need not address the cross-appeal.

## BACKGROUND

{2} Plaintiffs purchased a mobile home from Defendant through its Las Cruces sales office. Devin Pike and Bob Lancaster were, respectively, the sales agent and the sales manager of the Las Cruces office who conducted the sale of a three-bedroom mobile home to Plaintiffs. Although GreenPoint Credit (Lender) initially qualified Plaintiffs for a loan to buy a four-bedroom mobile home, Defendant told Plaintiffs that their loan application had been declined by Lend-

er. Defendant then negotiated the sale of a three-bedroom mobile home to Plaintiffs. Pike and Lancaster falsified Plaintiffs' income and employment information in order to qualify them for a higher loan on the three-bedroom home, also forging Plaintiffs' signatures on a credit application and another loan document. The amount of the loan for the three-bedroom mobile home was virtually the same as the amount of the loan for the four-bedroom mobile home. Pike and Lancaster inflated the value of Plaintiffs' existing mobile home and agreed to accept the trade-in as a 10% down payment on the purchase. They included in the loan amount the cost of constructing a garage and decks that were never provided to Plaintiffs but were falsely certified to Lender as having been constructed. They misrepresented certain features to be included in the mobile home. The mobile home was delivered to Plaintiffs with numerous defects that were never remedied by Defendant.

{3} Plaintiffs filed an action against Defendant in district court, alleging fraud, conversion, violation of the UPA, breach of warranty, excessive charges on interim construction loans in violation of NMSA 1978, § 56-8-9 (1980), and unlicensed sale of insurance in violation of the Insurance Code. Defendant counterclaimed to collect on the promissory note executed by Plaintiffs. The case was tried to the court. Following a three-day trial, the trial court found in favor of Plaintiffs on their claims, dismissed Defendant's counterclaim without prejudice, and entered a judgment awarding Plaintiffs compensatory and punitive damages and other relief. The trial court also awarded attorney fees of almost $80,000 to Plaintiffs. Defendant's two appeals and Plaintiffs' cross-appeal followed, and have been consolidated.

## DISCUSSION

### Finality of Judgment

{4} The trial court entered a judgment awarding damages to Plaintiffs under three alternative theories of liability: fraud, conversion, and violation of the UPA. The judgment states in pertinent part:

IT IS HEREBY ADJUDGED AND ORDERED:

1. Plaintiffs are awarded $9,500.00 in actual damages for Defendant's misrepresentations regarding the garage and decks, under the New Mexico [UPA]. Plaintiffs are awarded $17,900.00 in actual damages for fraud, regarding the garage, decks and trade-in. Plaintiffs are awarded $17,000.00 in actual damages for conversion, regarding the garage, decks and trade-in. *After passage of time for appeal, or when an appeal concludes, plaintiffs must elect a remedy and choose which one of these three damage awards to accept.*

. . . .

3. Plaintiffs are awarded $150,000.00 in punitive damages for Defendant's fraud and $150,000.00 in punitive damages for Defendant's conversion, and $31,440.00 additional damages for Defendant's willful violations of the New Mexico [UPA]. *After passage of time for appeal, or when an appeal concludes, Plaintiffs must elect a remedy and choose whether to accept the additional damages for unfair trade practices, or to accept the punitive damages for fraud or the punitive damages for conversion.*

(Emphasis added.) The judgment therefore awards Plaintiffs alternative relief, subject to their election, following the conclusion of this appeal.

{5} On its face, the judgment does not appear final because as framed it leaves open the final remedy to be chosen by Plaintiffs. Generally, "an order or judgment is not considered final unless all issues of law and fact have been determined and the case disposed of by the trial court to the fullest extent possible." *Kelly Inn No. 102, Inc. v. Kapnison,* 113 N.M. 231, 236, 824 P.2d 1033, 1038 (1992) (internal quotation marks and citation omitted). "Where a judgment declares the rights and liabilities of the parties to the underlying controversy, a question remaining to be decided thereafter will not prevent the judgment from being final if resolution of that question will not alter the judgment or moot or revise decisions embodied therein." *Id.* at 238, 824 P.2d at 1040. In this case, an election made following the appeal would appear to "moot" decisions em-

bodied in the judgment on the alternative grounds of recovery not pursued to satisfaction by Plaintiffs. In addition, because an election would require Plaintiffs to decide which substantive theory it ultimately relies on for recovery, we would hesitate to construe it as a purely ministerial act. *See State v. Candy L.*, 2003–NMCA–109, ¶ 6, 134 N.M. 213, 75 P.3d 429 (recognizing that outstanding ministerial acts, involving no substantive determinations, do not defeat finality). Thus, due to our jurisdictional concerns, we requested supplemental briefing on the question of whether the judgment in this case is final and appealable. *See Khalsa v. Levinson*, 1998–NMCA–110, ¶ 12, 125 N.M. 680, 964 P.2d 844.

{6} We agree with the parties that this case does not present a typical election of remedies problem. "The essence of the doctrine of election of remedies is the conscious choice, with full knowledge of the facts, of one of two or more inconsistent remedies." *Naranjo v. Paull*, 111 N.M. 165, 169, 803 P.2d 254, 258 (Ct.App.1990) (internal quotation marks and citation omitted). The doctrine exists to prevent double recovery for a single wrong. *See Liddle v. A.F. Dozer, Inc.*, 777 So.2d 421, 422 (Fla.Dist.Ct.App. 2000). Thus, when one remedy depends on affirming a contract and another on repudiating the contract, the remedies are mutually exclusive, and the party seeking relief must elect one of them. *See Smith v. Galio*, 95 N.M. 4, 8, 617 P.2d 1325, 1329 (Ct.App.1980). The election of remedies doctrine does not apply when remedies are merely cumulative. *Williams v. Selby*, 37 N.M. 474, 476, 24 P.2d 728, 729 (1933). In this case, Plaintiffs were awarded alternative or concurrent damages, not inconsistent remedies. The judgment, by its terms, precludes double recovery because Plaintiffs must choose between alternative remedies and are entitled to but one satisfaction for their injuries. Therefore, the doctrine of election of remedies does not presently apply to this case.

{7} We further acknowledge that the judgment in this case is not one that adjudicates liability but leaves undecided the question of damages. Our courts have firmly held that such judgments are not final and appealable.

*See, e.g., Valley Improvement Ass'n v. Hartford Accident & Indem. Co.*, 116 N.M. 426, 429, 863 P.2d 1047, 1050 (1993); *Principal Mut. Life Ins. Co. v. Straus*, 116 N.M. 412, 413–14, 863 P.2d 447, 448–49 (1993). Here, the judgment finally adjudicates the rights and liabilities of the parties and assesses damages against Defendant, which are quantified in the judgment. *See id.* (determining that a judgment that awards damages but fails to quantify them is not final). Thus, the judgment does not fall under the category of non-final judgments that leaves the award of damages unresolved.

{8} The judgment, however, does impose an election upon Plaintiffs that has yet to be exercised, thus making the judgment seemingly inconclusive. Some courts have held that a judgment awarding alternative or conditional relief subject to an election by the prevailing party is not final until an election has been made. *See, e.g., McKinney v. Gannett Co.*, 694 F.2d 1240, 1248–49 (10th Cir. 1982); *Mid–State Homes, Inc. v. Beverly*, 20 Ark.App. 213, 727 S.W.2d 142, 143 (1987). However, as Defendant notes, this approach has been criticized by the authors of one prominent treatise as "unfortunately formalistic," 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3915.3, at 292 n. 14 (2d ed.1992), since it ignores whether requiring an immediate election would "deflect an appeal, provide a better basis for appellate decision, or reduce the risk of further proceedings after appeal." *Id.* at 291.

{9} In this case, both parties argue that the judgment should be treated as final for purposes of appeal because doing so would promote the policies of avoiding piecemeal appeals and facilitating meaningful review of the appellate issues. *See Kelly Inn No. 102, Inc.*, 113 N.M. at 239–40, 824 P.2d at 1041–42. Plaintiffs explain that the trial court entered the judgment as it did to allow Plaintiffs full recovery while also permitting Defendant to raise all of its arguments on appeal. On appeal, Defendant challenges the trial court's compensatory damages awards under all three theories and also attacks the basis of the punitive damages award. On cross-appeal, Plaintiffs claim that the trial

court erred in reducing the amount of punitive damages. According to Plaintiffs, if a formal election of remedies were mandated by this Court prior to a consideration of the merits of the appeal, piecemeal appeals from multiple, successive judgments might result because Plaintiffs would be entitled to continue pursuing all remaining avenues of recovery until satisfaction of judgment is obtained. *See Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1355 (Okla.1988) ("Where the remedies are alternate or concurrent there is no bar until satisfaction of the judgment has been obtained. The plaintiff may pursue concurrent remedies at the same time until there is satisfaction of the judgment.").

{10} Defendant also points out that, aside from its elective nature, "the judgment in this case is not materially different from a judgment awarding relief to claimants who have prevailed on multiple, alternative theories allowing different amounts of monetary recovery." Defendant explains that the trial court "would ordinarily award judgment for the largest amount recoverable based on the most favorable theory on which the claimants had succeeded." The party appealing would then challenge the award under that theory, and the claimants would not only defend recovery on that basis but would argue that the award is affirmable under any theory of recovery considered below. *See Manouchehri v. Heim*, 1997–NMCA–052, ¶ 13, 123 N.M. 439, 941 P.2d 978. Thus, according to Defendant, because all the same issues would come before the reviewing court in any event, remand for a formal election would serve no purpose and would only delay resolution of the issues on appeal.

■ {11} We appreciate the procedural complexities and the undue delay that remand for a formal election would likely cause in this case. Accepting the judgment as final would serve the purposes of preventing piecemeal appeals, promoting judicial economy, and facilitating meaningful review of the issues. *See Executive Sports Club, Inc. v. First Plaza Trust*, 1998–NMSC–008, ¶ 11, 125 N.M. 78, 957 P.2d 63. Because the concept of finality is "given a practical, rather than a technical, construction," *Kelly Inn No. 102, Inc.*, 113 N.M. at 236, 824 P.2d at 1038,

we hold that the judgment in this case, while unorthodox in form and reserving a formal election until after appeal, is sufficiently final for purposes of appeal. *Cf. Cusumano v. Microsoft Corp.*, 162 F.3d 708, 712 (1st Cir. 1998) (discussing that "a court's retention of jurisdiction in order to facilitate the consideration of possible future relief does not undermine the finality of an otherwise appealable order"). In so holding, however, we express no opinion or preference regarding when an election between alternative but concurrent remedies should be made by a prevailing party. Our holding is limited solely to the particular judgment and the unusual circumstances in the case before us. We therefore turn to the merits of the appeal.

## Compensatory Damages for Fraud

{12} The trial court awarded to Plaintiffs compensatory damages of $17,900 for fraud. This award was based on the trial court's findings that Defendant (1) fraudulently obtained the disbursement of $9,500 from Plaintiffs' loan by falsely certifying the construction of nonexistent garage and decks, and (2) fraudulently induced Plaintiffs to trade in their existing mobile home for a credit of $8,400, for which they received no value.

■ {13} Defendant does not challenge the trial court's finding that two of its employees committed fraud in the sale of the mobile home to Plaintiffs. Defendant, however, claims that Plaintiffs are not entitled to actual damages for fraud because they have made no payment on the promissory note held by Defendant, and thus have sustained no present financial injury. We disagree.

{14} As a result of Pike's and Lancaster's misrepresentations, Plaintiffs executed a promissory note in the principal amount of $82,688.75, covering the purchase price of the mobile home, the lot, the garage, the decks, and related expenses. Plaintiffs also signed a security agreement and mortgage to secure payment of the note. By signing the note, security agreement, and mortgage, Plaintiffs incurred a legal obligation in the amount of $82,688.75, plus interest. The note, security agreement, and mortgage were assigned by Lender to Defendant pursuant to a recourse agreement. Defendant has sought to enforce

Plaintiffs' financial obligation and filed a counterclaim in this action to collect on the note and foreclose the mortgage. Plaintiffs have been forced to defend the counterclaim, incurring legal expenses. By suing Defendant for fraud and seeking damages, Plaintiffs have opted to affirm, rather than rescind, the sale. *See Everett v. Gilliland*, 47 N.M. 269, 275, 141 P.2d 326, 330 (1943) ("It was the privilege of the plaintiff, thinking himself to have been defrauded, to determine his course of action. He could either bring an action to rescind the contract or affirm and sue for damages.").

{15} Thus, even though Plaintiffs have not yet paid on the promissory note, by signing the note and affirming the sale, they incurred an enforceable legal obligation and thus have sustained actionable damage for fraud. *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212 (Tex.Ct.App.2001) ("The word 'damage' should not be restricted to a monetary loss; that is, it need not be measured in money, but it is sufficient if the defrauded party has been induced to incur legal liabilities or obligations different from that represented or contracted for."); 37 Am. Jur.2d *Fraud and Deceit* § 275 (2001) (recognizing that a "false statement that results in actual damage to the plaintiff's economic or legal relationships will support an action for fraud"); 37 C.J.S. *Fraud* § 55, at 242–43 (1997) (explaining that "the fact that actual monetary loss has not yet occurred will not preclude recovery for fraud if such loss is inevitable, as where the defrauded party has incurred a binding legal obligation"); *cf. Sharts v. Natelson*, 118 N.M. 721, 725, 885 P.2d 642, 646 (1994) (defining "actual injury," for the purpose of determining when cause of action for attorney malpractice accrues, as "the loss of a right, remedy, or interest, or . . . the imposition of a liability" and noting that it is immaterial "whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred" (internal quotation marks and citation omitted)). Moreover, Defendant has taken affirmative action to collect on the note, causing legal injury to Plaintiffs. *Cf. Daniels v. Coleman*, 253 S.C. 218, 169 S.E.2d 593, 597 (1969) (holding that there is no legal injury or dam-

age where the evidence established that the appellant had not sought to recover on the note and mortgage, and the note and the mortgage were returned to the appellees, but refused).

{16} Defendant further contends that the award of compensatory damages for fraud is premature because Defendant's counterclaim was dismissed without prejudice, and Plaintiffs' liability on the note now remains unresolved in another proceeding. Defendant claims that Plaintiffs' damages cannot be ascertained until their liability on the note is adjudicated. We note that Defendant has not informed us how this argument was preserved in the trial court. *See* Rule 12–216(A) NMRA; *Young v. Van Duyne*, 2004–NMCA–074, ¶ 9, 135 N.M. 695, 92 P.3d 1269 ("We are under no obligation to search the record to locate information in order to save a party from lack of preservation of issues."); *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987). However, even assuming that the issue was preserved, we conclude that Plaintiffs are entitled to recover damages for fraud even if the claim on the promissory note has not yet been determined. As we explained above, Plaintiffs sustained actual injury when they incurred the legal obligation on the note. Moreover, as Plaintiffs point out, the general rule is that damages for fraud are measured at the time of the transaction. *See Indus. Supply Co. v. Goen*, 58 N.M. 738, 741, 276 P.2d 509, 511 (1954) (explaining that New Mexico "adopts the general rule that the defrauded purchaser may recover the difference between the real and represented values of the property *at the time of the transaction*" (emphasis added)); *see generally* 37 Am.Jur.2d *Fraud and Deceit* § 275. When fraud is established, courts generally award the defrauded party the benefit of the bargain or "the difference between the real and the represented value of the property, regardless of the fact that the actual loss suffered might have been less." *Stewart v. Potter*, 44 N.M. 460, 464, 104 P.2d 736, 739 (1940). The purpose of benefit of the bargain damages is to compensate the defrauded party for amounts that would have been received if the situation had been as the de-

792

frauding party represented. In this case those damages can be ascertained or measured with reasonable certainty without considering Plaintiffs' liability on the promissory note. Although the damages awarded to Plaintiffs for fraud may ultimately be offset by the amount found to be owed on the promissory note, the unresolved claim on the note does not in any way preclude Plaintiffs' instant recovery of damages for fraud.

{17} Defendant additionally claims that the trial court erred in awarding compensatory damages of $8,400 for the loss of Plaintiffs' trade-in. Defendant claims that Plaintiffs are not entitled to damages for the trade-in because they received a credit of $8,400 for the trade-in, which was accepted as a down payment on the purchase. Plaintiffs, however, contend that because Defendant inflated the purchase price of the mobile home to obtain additional financing from Lender, they did not receive any value for the trade-in because that amount was offset by the inflated and fraudulent charges to Plaintiffs. Defendant counters that, insofar as the purchase price was inflated, it was done so by $9,500, the cost of the nonexistent garage and decks, for which Plaintiffs have already been compensated, and therefore the award of $8,400 constitutes double recovery. We agree that the additional award for the trade-in is duplicative of the award for the fraudulent inclusion of the garage and decks. We therefore reverse the award of $8,400 for the loss of the trade-in. *See generally Hale v. Basin Motor Co.*, 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990) ("New Mexico does not allow duplication of damages or double recovery for injuries received.").

{18} On appeal, we review the trial court's findings of damages to determine whether they are supported by substantial evidence. *Moody v. Stribling*, 1999–NMCA–094, ¶ 37, 127 N.M. 630, 985 P.2d 1210. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). "When determining whether a finding of fact is supported by substantial evidence, we review the evidence in the light most favorable to upholding the

finding and indulge all reasonable inferences in support of the trial court's decision." *Robertson v. Carmel Builders Real Estate*, 2004–NMCA–056, ¶ 20, 135 N.M. 641, 92 P.3d 653.

{19} In arguing that substantial evidence supports the award of $8,400, Plaintiffs rely on three exhibits: a series of advance calculation sheets prepared by Defendant in the course of negotiating the sale of a mobile home to Plaintiffs. The first of the exhibits pertains to the four-bedroom mobile home Plaintiffs originally sought to buy, and the other two exhibits pertain to two different three-bedroom mobile homes, including the one that Plaintiffs ultimately bought. Plaintiffs point out that the loan amount for all three proposals was roughly the same, approximately $82,400, although the adjusted invoice amount and the selling price on each one varied, thus establishing that Defendant sold Plaintiffs the three-bedroom home for essentially the same price as the four-bedroom home. Plaintiffs claim that Defendant should have charged Plaintiffs $18,000 less for the three-bedroom home they purchased, since the adjusted invoice amount of the three-bedroom home was $24,064, as compared to $42,090 for the four-bedroom home. Plaintiffs argue that Defendant "could not make up that $18,000 difference with the $7,500 garage alone; they had to pad the deal to make it look like they were giving the $8,[4]00 trade-in value they promised when, in truth, Plaintiffs did not receive any actual value for the trade-in." They also argue that the fraud related to the trade-in was entirely independent of the fraud related to the garage.

{20} Plaintiffs, however, do not point to any testimony to support their view that Defendant inflated the price of the three-bedroom home by $18,000, and that the fraud related to the trade-in is distinct from the fraud related to the garage. Our review of the uncontradicted testimony at trial indicates that Defendant artificially inflated the trade-in allowance to induce Plaintiffs to purchase the home and then attempted to recoup the difference by fraudulently including in the amount of the loan the cost of the fictitious garage. In other words, the evidence establishes that the fraud related to

the trade-in and the fraud related to the garage are part of a single interconnected scheme.

{21} Because Plaintiffs did not have the cash to make the 10% down payment, they were allowed to trade in their existing mobile home and received a credit of $8,400 which was accepted as a down payment. Defendant assigned the NADA book value of $11,349 to the trade-in and subtracted the almost $3,000 that Plaintiffs still owed on the mobile home to arrive at the net amount of $8,400. However, the value assigned to the trade-in was substantially inflated because Defendant subsequently resold the mobile home for only about $1,500. According to the uncontradicted testimony of the district manager, William Kasprzyk, there was a "[d]irect correlation" between the allowance on the trade-in and the inclusion of the garage in the loan. He testified that to make up for the loss of profit on the trade-in, Defendant improperly generated additional funds by including in the amount of the loan the cost of constructing a fictitious garage on Plaintiffs' property.

{22} The trial court's findings of fact reflect that it accepted the evidence concerning the interrelationship between the trade-in and the garage. In particular, the trial court found that (1) Defendant inflated or misrepresented the value allocated to the trade-in; (2) Defendant "used the value and money from [the] non-existent, falsely-certi-fied-as-completed garage to make up the dif-ference between the value [Defendant] allo-cated to [Plaintiffs'] 1980 Melody trailer and the value [Defendant] reported to [Plaintiffs] and [Lender];" and (3) when Plaintiffs traded in their mobile home, Defendant intended to deprive them of $7,500 of the value of the mobile home, which was the same amount that the nonexistent garage cost. "Unless the district court makes findings of fact, or rejects specific uncontradicted testimony with reasons on the record, we presume the district court believed the uncontradicted evi-dence." *State v. Zamora*, 2005–NMCA–039, ¶ 8, 137 N.M. 301, 110 P.3d 517, cert. grant-ed, 2005–NMCERT–004, 137 N.M. 455, 112 P.3d 1112. Moreover, "when a trial court makes specific written findings of fact that

are supported by substantial evidence, those findings prevail over any inconsistent conclu-sions of law or an inconsistent judgment." *State v. Walker*, 1998–NMCA–117, ¶ 7, 125 N.M. 603, 964 P.2d 164; *see also El Paso Field Servs. Co. v. Montoya Sheep & Cattle Co.*, 2003–NMCA–113, ¶ 14, 134 N.M. 375, 77 P.3d 279. Therefore, because the trial court recognized the connection between the trade-in and the garage, and awarded Plaintiffs compensatory damages for the fraudulent in-clusion of the garage and the decks, we conclude that the additional award for the loss of the trade-in amounts to double recov-ery. *See Cent. Sec. & Alarm Co. v. Mehler*, 1996–NMCA–060, ¶ 11, 121 N.M. 840, 918 P.2d 1340 ("The purpose of compensatory damages is to make the injured party whole by compensating it for losses."). Thus, we reverse the award of $8,400, but affirm the award of $9,500 under the benefit of the bargain measure of damages for fraud.

## Compensatory Damages for Conversion

{23} Defendant further claims that the trial court erred in awarding to Plaintiffs compensatory damages for conversion. Be-cause Plaintiffs would be entitled to no more than $9,500 in compensatory damages for conversion, even assuming that the claim was established, we need not address Defendant's conversion arguments. This is because the same double recovery limitation that was dis-cussed in connection with fraud also applies to compensatory damages for conversion.

## UPA Claims

{24} The trial court awarded $1,720 to Plaintiffs as actual damages for Defen-dant's unlicensed sale of property damage insurance to Plaintiffs. The award was made pursuant to the UPA and therefore was also subject to trebling. Defendant acknowledges that Pike and Lancaster were not licensed to sell insurance to Plaintiffs, in violation of NMSA 1978, § 59A–12–6(D) (1984), but claims there was no evidence connecting the unlawful insurance practice to the damages awarded to Plaintiffs. We agree.

{25} Section 57–12–10(B) of the UPA provides that any claimant "who suffers any loss of money or property, real or per-

sonal, *as a result* of any employment by another person of a method, act or practice declared unlawful by the [UPA] may bring an action to recover *actual damages* or the sum of one hundred dollars ($100), whichever is greater." (Emphasis added.) Thus, to obtain financial recovery under the UPA, Defendant's deceptive trade practice must have caused Plaintiffs to suffer actual damages. *See* UJI 13–1707 NMRA (instructing that plaintiffs "may recover damages proximately caused by the deception"); *see also Bogle v. Summit Inv. Co.*, 2005–NMCA–024, ¶ 36, 137 N.M. 80, 107 P.3d 520 (stating that "any person who suffers a financial loss as the result of another willfully engaging in an unfair trade practice may recover treble damages" under the UPA). However, as Defendant points out, the evidence presented at trial established that (1) property damage or hazard insurance was a requirement of the loan, as disclosed in the promissory note; (2) Plaintiffs wished to purchase the insurance from Defendant; (3) the price of the insurance was accurately disclosed to them; and (4) they received the policy for which they were charged. Plaintiffs do not directly respond to Defendant's claim of lack of causation or actual injury, asserting only that "Defendant cannot be allowed to profit from its own wrongdoing." We hold that the evidence is insufficient to establish that Plaintiffs sustained any actual injury as a result of the deceptive practice in question, and therefore reverse the award of damages for the sale of insurance.

█ {26} Defendant also challenges the award of damages under the UPA for additional utility charges, inconvenience, and aggravation arising from the defects in the mobile home. During trial, Plaintiffs stipulated, for purposes of resolving an evidentiary dispute, that their breach of warranty claim based on defects in the mobile home was separate from their UPA claim concerning the sales transaction itself. Moreover, when introducing testimony concerning the damages resulting from the defects in the mobile home, counsel for Plaintiffs argued that it was relevant to their breach of warranty claim. The trial court, however, awarded only equitable relief on Plaintiffs' breach of warranty claim. In light of Plaintiffs' stipulation during trial that their breach of warranty claim is in no way "subsumed into the [UPA]," we hold that the trial court erred in awarding damages under the UPA for the additional utility charges, inconvenience, and aggravation arising from the defects in the home. We, however, note that the award of UPA damages for Defendant's failure to deliver a home with certain custom features ordered by Plaintiffs remains unaffected, as those damages appear to relate to promises made by Defendant during the sale itself and thus are properly awarded under the UPA. Thus, we reverse the award of actual and treble damages related to the sale of insurance, and the award of actual and treble damages related to the additional utility charges, inconvenience, and aggravation.

## Punitive Damages

█ {27} The purpose of punitive damages is to punish and deter wrongful conduct and thus requires evidence of a culpable mental state, combined with conduct that is willful, wanton, malicious, reckless, oppressive, or fraudulent. *Enriquez v. Cochran*, 1998–NMCA–157, ¶ 121, 126 N.M. 196, 967 P.2d 1136. In New Mexico, a principal may be held vicariously liable for punitive damages when it "has in some way authorized, ratified, or participated in the wanton, oppressive, malicious, fraudulent, or criminal acts of its agent." *Albuquerque Concrete Coring Co. v. Pan Am World Servs., Inc.*, 118 N.M. 140, 143, 879 P.2d 772, 775 (1994). "A corporation can ratify the acts of its agents by acquiescence in or acceptance of the unauthorized acts." *Id.* at 144, 879 P.2d at 776. However, the ratification must be accompanied by the principal's knowledge of the circumstances surrounding the agent's misconduct. *Id.; see also Beneficial Fin. Co. of N.M. v. Alarcon*, 112 N.M. 420, 424, 816 P.2d 489, 493 (1991) ("A party held to a ratification shall have had full knowledge of all the material facts concerning the transaction."); *Romero v. Bank of the S.W.*, 2003–NMCA–124, ¶ 19, 135 N.M. 1, 83 P.3d 288 (explaining that ratification occurs only when there is "full knowledge of all the material facts" and an "intent to ratify" the transaction, "either expressly or by conduct").

{28} Defendant claims that the trial court erred in imposing punitive damages because the evidence was inadequate to prove corporate misconduct by Defendant. The trial court awarded punitive damages on the basis that Defendant ratified the actions of Pike and Lancaster. The trial court found that Defendant ratified their conduct by (1) paying Pike his full commission on the sale of the mobile home to Plaintiffs, (2) not immediately terminating Lancaster upon discovering his and Pike's misconduct, (3) authorizing the construction of a fence in place of a garage on Plaintiffs' property without Plaintiffs' permission, and (4) advancing positions in the lawsuit that deny wrongdoing or responsibility.

{29} We conclude that the evidence upon which the trial court relied does not support ratification of Pike's and Lancaster's misconduct by Defendant. In urging us to affirm the trial court's award, Plaintiffs point to evidence that the paperwork submitted by the local sales representative and manager contained discrepancies and irregularities that should have been detected and investigated by Defendant, but were not. However, as a matter of law, inaction alone is not sufficient to establish ratification of an agent's conduct; ratification must be founded on knowledge of all facts material to the agent's unauthorized action, and not on negligence in failing to discover them. *See Albuquerque Concrete Coring Co.*, 118 N.M. at 144, 879 P.2d at 776 (explaining that something more than the defendant's "receipt of a document which supposedly represents culpable conduct must be shown to establish corporate complicity through authorization, ratification, or participation"); *Beneficial Fin. Co. of N.M.*, 112 N.M. at 424, 816 P.2d at 493; *Romero*, 2003–NMCA–124, ¶ 19, 135 N.M. 1, 83 P.3d 288. In this case, there is no evidence that Defendant had any knowledge of the circumstances surrounding the agents' fraud when the documentation in question was submitted and reviewed by the Albuquerque and Houston offices, or when the sales commission was paid to Pike.

{30} In support of ratification, Plaintiffs also rely on evidence that Defendant was aware of the problem of falsification in the mobile home industry, but ignored warnings by the Albuquerque zone office that local sales offices should not be allowed to submit financing documents directly to lenders, but should be required to have them reviewed and verified by the zone office. Although Defendant did not adopt the recommendation of the Albuquerque zone office, it is undisputed that Defendant instituted an alternative method of verification of sales information through a central finance office in Portland. Moreover, in response to the problems in the mobile home industry, Defendant had adopted a corporate policy expressly prohibiting dishonest acts by sales personnel, and in 1999 convened a nationwide "Call to Integrity" meeting of managers to specifically address the problem of fraud in the industry. In light of this evidence in the record, which appears to be undisputed, we conclude that Defendant's decision not to adopt the particular policy recommended by the Albuquerque zone office does not rise to the level of corporate indifference necessary to justify an award of punitive damages. *See McNeill v. Rice Eng'g & Operating, Inc.*, 2003–NMCA–078, ¶ 40, 133 N.M. 804, 70 P.3d 794 ("We know of no precedent, and Plaintiffs cite none, which requires companies to take every means available, no matter how costly or how feasible to avoid any potential economic injury, even if it knows or has reason to know such may be the consequence."); *cf. Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269–70, 881 P.2d 11, 14–15 (1994) (affirming award of punitive damages where company's negligent installation of propane conversion system in car, together with pattern of safety regulation violations by company, in the face of serious risks of danger, amounted to corporate indifference and reckless conduct).

{31} The trial court also based ratification on its finding that, when the fraud in the transaction was revealed to Defendant, the district manager directed the local sales manager to have a fence, instead of a garage, built on Plaintiffs' property without their permission. However, we are unable to find support in the record for the trial court's finding. Our review of the record indicates as follows. When Plaintiffs reported the defects in the home to Defendant, it sent district manager Kasprzyk to Las Cruces to

investigate. Upon inspecting Plaintiffs' home, Kasprzyk acknowledged the defects and poor condition of the home and arranged for repairs, which were apparently never done. Then when the falsification of Plaintiffs' loan first came to light, Kasprzyk again went to Las Cruces and saw that, contrary to the loan documents, there was no garage on Plaintiffs' property, which was too small to even fit a garage. After being apprised of the situation, the zone vice-president, Jim Gifford, asked Kasprzyk to find out what Plaintiffs wanted instead of the garage. Kasprzyk relied on Lancaster, as the local manager, to address the matter with Plaintiffs. During that meeting, Plaintiffs expressed a desire to use the money allocated to the garage to build a concrete slab, porch, and fence on the property instead. Without obtaining Plaintiffs' permission, Lancaster arranged to have a fence, which was worth less than $1,000, built on Plaintiffs' property. There is no evidence in the record, however, that this unauthorized act was done at Kasprzyk's direction. Rather, Kasprzyk believed that an agreement had been reached with Plaintiffs to substitute the fence for the garage. Where the district manager and the zone vice-president had no knowledge of the unilateral actions of Lancaster, and sought only to settle the controversy with Plaintiffs, we cannot conclude that it was reasonable to find ratification. *See Albuquerque Concrete Coring Co.*, 118 N.M. at 143, 879 P.2d at 775.

{32} The trial court also found that Defendant's failure to immediately terminate Pike and Lancaster amounted to ratification. However, it is undisputed that Pike was terminated by Defendant approximately two months later based upon similar misconduct in another sale, and that Gifford ordered that Lancaster be terminated after an investigation of his misconduct in this transaction, but Lancaster resigned before he could be fired. Thus, the cumulative conduct of employees in this case does not support a finding of ratification by Defendant. *See Clay*, 118 N.M. at 270, 881 P.2d at 15 (recognizing that culpable mental state required for award of punitive damages may be based on the cumulative conduct of employees). Rather, the evidence in the record supports Defendant's description of Pike and Lancaster as "renegade employees" whose egregious actions were neither ratified nor condoned by Defendant, but once discovered and investigated, were reasonably dealt with by their supervisors. *See Gillingham v. Reliable Chevrolet*, 1998–NMCA–143, ¶ 20, 126 N.M. 30, 966 P.2d 197 (explaining that "in order to impose punitive damages against an employer, its conduct must be found to be willful, reckless, or wanton, *apart from the conduct of its employee*" (emphasis added)); *cf. Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 48, 127 N.M. 47, 976 P.2d 999 (upholding award of punitive damages against employer for intentional infliction of emotional distress where the conduct of one employee was witnessed and condoned "by high level supervisory personnel").

{33} In imposing punitive damages, the trial court also relied on Defendant's litigation conduct or defense of this lawsuit. New Mexico case law, however, does not appear to recognize a principal's litigation conduct as a basis for ratification for purposes of determining punitive damages. *See Albuquerque Concrete Coring Co.*, 118 N.M. at 144, 879 P.2d at 776 (refusing to recognize breach of contract and party's defense of contract claim "to the very end" as basis for punitive damages); *Burguete v. G.W. Bond & Bro. Mercantile Co.*, 43 N.M. 97, 105, 85 P.2d 749, 754–55 (1938) (indicating that opposing party's claims in litigation did not establish ratification since unresolved factual issues were for the court to decide); *In re Estate of Duncan*, 2002–NMCA–069, ¶ 25, 132 N.M. 426, 50 P.3d 175 (stating that the personal representative's decision to litigate issues in estate matter did not amount to ratification of lease since litigation itself was intended to sort out respective interests of the parties), *rev'd on other grounds*, *In re Estate of Duncan*, 2003–NMSC–013, ¶¶ 1, 24, 133 N.M. 821, 70 P.3d 1260. Thus, we decline to treat Defendant's position in this lawsuit as a basis for finding ratification by Defendant.

{34} Finally, Plaintiffs argue that the award of punitive damages should be affirmed because Lancaster, as local sales manager, was employed in a managerial capacity. In New Mexico, punitive damages may be imposed upon a principal if "the

agent was employed in a managerial capacity and was acting in the scope of employment." *Albuquerque Concrete Coring Co.,* 118 N.M. at 145, 879 P.2d at 777 (internal quotation marks and citations omitted). This theory, however, was not specifically included in Plaintiffs' requested findings and conclusions, and was not clearly raised by Plaintiffs until their response to Defendant's motion to amend judgment. *See Famiglietta v. Ivie–Miller Enters.,* 1998–NMCA–155, ¶ 21, 126 N.M. 69, 966 P.2d 777 (declining to review argument not made below). In imposing punitive damages, the trial court explicitly relied on Defendant's ratification of its employees' misconduct, and not the managerial capacity rule. An appellate court will not affirm the ruling of the trial court on a ground not relied upon by the trial court if doing so would be unfair to the appellant. *Meiboom v. Watson,* 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154; *Pinnell v. Bd. of County Comm'rs of Santa Fe County,* 1999–NMCA–074, ¶ 14, 127 N.M. 452, 982 P.2d 503 (explaining that an appellate court will not assume the role of the trial court and delve into fact-dependent inquiries when opposing party has not had an opportunity to develop record in response and would therefore be prejudiced). Thus, we decline to address whether the managerial capacity rule applies under the facts of this case.

{35} We reverse the trial court's award of punitive damages against Defendant based on insufficiency of the evidence to support a finding of ratification by Defendant. Although an appellate court is required to view the evidence in the light most favorable to the prevailing party and indulge all reasonable inferences in support of the judgment, *Sunwest Bank of Albuquerque, N.A. v. Daskalos,* 120 N.M. 637, 639, 904 P.2d 1062, 1064 (Ct.App.1995), we conclude that no reasonable view of the evidence in this case supports a finding of ratification by Defendant. In light of our reversal of the punitive damages award, we do not address Plaintiffs' claim on cross-appeal that the trial court erred in reducing the award.

### Dismissal of Defendant's Counterclaim Without Prejudice

{36} Defendant argues that the trial court erred in dismissing, without prejudice, its counterclaim to collect on the promissory note signed by Plaintiffs. At the close of the evidence, Plaintiffs moved for judgment on the counterclaim on the ground that Defendant failed to produce the original note and thus did not satisfy its burden of proof on the counterclaim. *See* NMSA 1978, § 55–3–308(a) (1992). They argued that because Defendant was not the original holder of the note, it was required to prove possession of the original note in order to collect payment, relying on the Arkansas case of *McKay v. Capital Resources Co.,* 327 Ark. 737, 940 S.W.2d 869, 871 (1997). Defendant argued below, and continues to argue on appeal, that Plaintiffs waived objection to the failure to produce the original note because the issue was not raised until the close of trial, and Plaintiffs had previously stipulated to the admissibility of all exhibits, including a copy of the note. Although Defendant admitted that it did not have the original note at trial, it allegedly obtained possession of the original note from Lender when it later moved for reconsideration. We agree that Plaintiffs waived any objection to the non-production of the original note at trial.

{37} Plaintiffs do not respond directly to Defendant's claim of waiver, but argue only that Defendant failed to meet its evidentiary burden under the Uniform Commercial Code. However, in a collection action, the failure to produce the original note or instrument may be waived or excused by stipulation or admission of the parties. *Recreation Servs., Inc. Defined Benefit Plan v. Utah Mortgage Co.,* 720 F.Supp. 124, 125 (N.D.Ill. 1989); *see also Tassock v. Hogan,* 272 Or. 694, 538 P.2d 910, 912 (1975).

{38} In this case, Plaintiffs admitted in their answer to the counterclaim that they signed the note. They admitted that the note was assigned to Defendant and that Defendant was the current owner of the note. The pretrial order does not indicate that Plaintiffs challenged Defendant's status as the owner or holder of the note. Moreover, unlike the situation in *McKay,* 940 S.W.2d at

869–70, Plaintiffs in this case stipulated to the introduction and use of the copy of the note in evidence at the start of the trial, acknowledging that it was an "original exhibit." When Plaintiffs moved for dismissal of the counterclaim at the close of evidence, Defendant and even the trial judge were surprised by Plaintiffs' objection. Under these circumstances, we conclude that Plaintiffs waived any challenge to Defendant's failure to produce the original promissory note. *See Recreation Servs., Inc. Defined Benefit Plan,* 720 F.Supp. at 125; *Tassock,* 538 P.2d at 912; *cf. Apodaca v. AAA Gas Co.,* 2003–NMCA–085, ¶ 58, 134 N.M. 77, 73 P.3d 215 (noting that party's contention on appeal that the opposing party failed to authenticate the file introduced into evidence ignores the fact that the party stipulated to the file's authenticity). We therefore reverse and remand for further proceedings on Defendant's counterclaim.

■ {39} Because we reverse on the basis of waiver, we need not address Defendant's remaining challenge to the dismissal of the counterclaim, which was admittedly not preserved below. We note that Defendant further argues that the trial court erred in ruling, following the dismissal of the counterclaim, that Defendant forfeited interest on the promissory note pursuant to NMSA 1978, § 56–8–9(D) (1980). Defendant admits that this issue was not raised below, but argues that it is an issue of general public interest which may be excluded from the preservation requirement. We disagree. Defendant's issue, which pertains to the particular terms of the financing in this case, is not likely to affect the public at large or a great number of cases and litigants in the near future. *See Azar v. Prudential Ins. Co. of Am.,* 2003–NMCA–062, ¶ 28, 133 N.M. 669, 68 P.3d 909. Thus, the public interest exception does not apply, and we decline to reach Defendant's argument raised for the first time on appeal. Finally, because we reverse and remand on Defendant's counterclaim, we need not address Plaintiffs' contention on cross-appeal that the counterclaim should have been dismissed with prejudice.

## Award of Attorney Fees

■ {40} Defendant argues that the trial court erred in determining the amount of attorney fees to award to Plaintiffs under the UPA and the Insurance Code. The trial court awarded fees of approximately $80,000 to Plaintiffs. Defendant claims that the trial court failed to adequately apportion counsel's efforts between Plaintiffs' UPA claim and their other, non-fee generating claims. Specifically, Defendant contends that the trial court improperly awarded Plaintiffs attorney fees for their claims related to (1) the unlicensed sale of insurance under the Insurance Code, (2) the violation of statutory limits on interim construction loan charges, and (3) punitive damages against Defendant. Defendant acknowledges that it did not raise below its argument that Plaintiffs are not entitled to attorney fees under the Insurance Code. Because this issue was not preserved for review, we do not consider whether attorney fees were improperly awarded under the Insurance Code. *See* Rule 12–216(A); *Woolwine,* 106 N.M. at 496, 745 P.2d at 721 ("To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

■ {41} "The trial court has broad discretion in setting attorney fees, and an award will not be reversed unless there is an abuse of discretion." *Robertson,* 2004–NMCA–056, ¶ 48, 135 N.M. 641, 92 P.3d 653. "A trial court abuses its discretion when its decision is contrary to logic and reason." *Roselli v. Rio Cmtys. Serv. Station, Inc.,* 109 N.M. 509, 512, 787 P.2d 428, 431 (1990).

{42} In awarding attorney fees to Plaintiffs, the trial court entered, in part, the following findings:

5. The litigation of this entire case centered around [Defendant's] misrepresentations.

6. The same conduct which pertained to the fraud claims also was the conduct that violated the [UPA].

7. All of the time and work performed by Plaintiffs' attorneys proving their fraud claim also was performed in proving the [UPA] claim.

8. The time and work performed by Plaintiffs' attorneys, proving entitlement to punitive damages under the fraud claim, also was performed in proving the entitlement to treble damages for willful [UPA] claim.

9. The time and work Plaintiffs' counsel spent litigating the arbitration issue pertained to all claims, including the [UPA] claim.

10. No additional time was spent on the arbitration issue that did not include the work spent on the [UPA] claim.

11. In their fee application, Plaintiffs' counsel already deleted the time they spent working on the breach of warranty claim, which was not compensable.

12. The commission of unfair trade practices was an element of the usury claim that required presentation of evidence at trial. Plaintiffs' success in proving the violations of the [UPA] was directly related to their success in prevailing under the New Mexico usury statute.

13. A portion of the work of Plaintiffs' counsel on their usury claim, primarily their work on the legal issues, is not compensable.

14. The portion of the work of Plaintiffs' counsel, on the Truth in Lending Act claim in the original complaint, is not compensable.

{43} When a plaintiff asserts a UPA claim along with a number of other distinct claims, the trial court must "separate the claims and determine the amount of time spent on each." *Jaramillo v. Gonzales*, 2002–NMCA–072, ¶ 41, 132 N.M. 459, 50 P.3d 554. Even when "some facts are common to all the claims," the trial court must still "separate the claims and the proofs required for each" to the extent possible. *Id.* ¶ 40. Thus,

> when the attorney's services are rendered in pursuit of multiple objectives, some of which permit an award of fees and some of which do not, the court must make a reasoned estimate, based either on evidence or on its familiarity with the case at trial, of the proportion or quantum of services that are compensable and award fees only for those services.

*Economy Rentals, Inc. v. Garcia*, 112 N.M. 748, 765, 819 P.2d 1306, 1323 (1991).

{44} We conclude that the trial court met its obligation of separating the claims and estimating with reason the proportion of services compensable under the UPA based on the evidence submitted and its familiarity with the case. Defendant claims that the trial court erred in awarding fees related to work done under the UPA that promoted the success of Plaintiffs' usury claim, which is not compensable. The trial court, however, may properly award fees for UPA work that overlaps factually with another claim. *See Jaramillo*, 2002–NMCA–072, ¶ 40, 132 N.M. 459, 50 P.3d 554. Here, the trial court found that proof of an unfair trade practice "was an element of the usury claim that required presentation of evidence at trial" and deducted from its fee determination a portion of the time spent on other aspects or legal issues related to the usury claim. We defer to the trial court's reasoned estimate of the amount of work attributable to the UPA in this regard.

{45} Defendant also argues that the trial court erred in finding that the proof required for punitive damages under common law fraud is the same as the proof required for treble damages under the UPA. According to Defendant, because entitlement to punitive damages requires an additional showing of Defendant's vicarious liability, the trial court's award of fees under the UPA should be reduced accordingly. We, however, have difficulty discerning any appreciable difference in the levels of proof between the two claims in this case, particularly in light of our determination that the evidence of Defendant's ratification is insufficient. Moreover, as this Court has pointed out in the past, "the same conduct that violates the UPA may also form the basis of another cause of action that permits an award of punitive damages." *McLelland v. United Wisconsin Life Ins. Co.*, 1999–NMCA–055, ¶ 11, 127 N.M. 303, 980 P.2d 86. Thus, we cannot say that the trial court's finding was "contrary to logic or reason." *Roselli*, 109 N.M. at 512, 787 P.2d at 431. We therefore affirm the award of attorney fees.

{46} Nonetheless, because we reverse the award of certain damages under the UPA as discussed above, we remand to the trial court with instructions to redetermine the amount of attorney fees to be awarded Plaintiffs without counting any time and work required of counsel on the unsuccessful portions of the UPA claim. *See Klinksiek v. Klinksiek,* 2005–NMCA–008, ¶ 29, 136 N.M. 693, 104 P.3d 559 (recognizing that remand for reconsideration of attorney fee award is appropriate when the trial court's order is reversed in part); *Rabie v. Ogaki,* 116 N.M. 143, 149, 860 P.2d 785, 791 (Ct.App.1993). The parties have apparently stipulated that remand is appropriate in such an event. Finally, in light of our reversal in part of the UPA claim, we deny Plaintiffs' request for appellate attorney fees.

## CONCLUSION

{47} The judgment and orders of the trial court are affirmed in part and reversed in part, and the case is remanded for further proceedings in accordance with our opinion.

{48} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and CELIA FOY CASTILLO, Judges.