This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**KUCKELMAN PUMP SERVICE-ACCULECTRIC, INC.,**

Plaintiff-Appellee,

v.                                    **NO. 32,158 & 32,389**
                                      **(Consolidated)**

**HACIENDA DEL CEREZO, LTD., and STEPHEN KIRSCHENBAUM,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Barbara J. Vigil, District Judge**

Felker, Ish, Ritchie & Geer, P.A.
Randolph B. Felker
Santa Fe, NM

for Appellee

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil J. Kiehne
Albuquerque, NM

for Appellants

**MEMORANDUM OPINION**

**VANZI, Judge.**

{1}     In this consolidated appeal, Hacienda del Cerezo, Ltd. (Hacienda) appeals the district court's orders (1) directing a verdict against Hacienda on its counterclaims; (2) denying Hacienda's motion to amend the scheduling order deadlines to add an expert witness; (3) awarding Kuckelman Pump Service-Acculectric, Inc. (Kuckelman) its attorney fees incurred in defending one of Hacienda's motions to compel; (4) awarding Kuckelman its attorney fees incurred in connection with the suit; and (5) awarding Kuckelman prejudgment interest at an 18% annual rate. We affirm on the first four issues and reverse and remand to the district court for a determination of the proper amount of prejudgment interest to be awarded. We also grant Kuckelman's request for attorney fees incurred on appeal and remand to the district court for a determination of the proper amount of fees to be awarded.

**BACKGROUND**

{2}     Since the parties are familiar with the facts and proceedings and because this is a memorandum opinion, we do not provide a detailed discussion of background facts. In short, this matter began when Kuckelman brought a lien foreclosure and breach of contract action against Hacienda to secure payment for work Kuckelman had done on Hacienda's water well and for which Hacienda refused to pay. In its answer, Hacienda asserted various counterclaims against Kuckelman for violations of the Unfair Trade Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2009), fraud, and unjust enrichment related to misrepresentations

Kuckelman made regarding the value of copper wire and galvanized pipe salvaged from the well. Hacienda also asserted, as part of the general allegations in its counterclaims, that work Steve Kuckelman (Mr. Kuckelman) had done on Hacienda's well fourteen years earlier in 1995, as well as the work Kuckelman did in 2009, was negligently performed.

{3}     Approximately two weeks before the scheduled trial date, Hacienda's previous counsel moved to withdraw. The district court granted the motion and reset the trial and pretrial conference dates but ordered that all other deadlines in the scheduling order were to remain unchanged. Hacienda subsequently moved to amend the deadlines contained in the new scheduling order. The district court denied Hacienda's motion. The case ultimately went to trial. At the end of the presentation of evidence, Kuckelman moved for and the district court granted a directed verdict against Hacienda on all of its counterclaims. The jury returned a verdict for Kuckelman in the entire amount it had requested on the underlying lien foreclosure claim. After trial, the district court awarded Kuckelman its attorney fees and costs, pursuant to the lien foreclosure statute, NMSA 1978, § 48-2-14 (2007), as well as 18% prejudgment interest pursuant to NMSA 1978, § 56-8-4(A)(1) (2004), pursuant to the terms of the invoice Kuckelman had sent to Hacienda for the work performed. Hacienda timely appealed the district court's at-issue orders in two separate appeals, and we

3

consolidated. We address each of Hacienda's contentions in turn. Additional facts are included as pertinent to our discussion of the parties' arguments.

**DISCUSSION[1]**

**Directed Verdicts**

**Standard of Review**

{4}     We review de novo the district court's decision on a motion for a directed verdict. *McNeill v. Rice Eng'g & Operating, Inc.*, 2003-NMCA-078, ¶ 31, 133 N.M. 804, 70 P.3d 794. "We will uphold a district court's grant of directed verdict only if it is clear that the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Richter v. Presbyterian Healthcare Servs.*, 2013-NMCA-___, ¶ 57,

---

[1] As an initial matter, we note that neither Hacienda's brief in chief nor its reply brief fully complies with Rule 12-213 or 12-305 NMRA. First, the body of the briefs are not double-spaced. Moreover, the briefs rely on the extensive use of footnotes, including for all record cites, case citations, and parenthetical explanations of case law, all of which are single-spaced. Citational footnotes make for a disjointed and frustrating reading experience and can be used to avoid complying with the Rules of Appellate Procedure. Counsel for Hacienda is instructed to avoid their extensive usage and to double-space its briefs in the future. *See Schmidt v. St. Joseph's Hosp.*, 1987-NMCA-046, ¶ 15, 105 N.M. 681, 736 P.2d 135 (noting that extensive use of footnotes is contrary to the spirit of our rules and should be discouraged). Counsel is also reminded that the rules promote this Court's efficient and timely resolution of issues on appeal and that failure to comply with them may have serious consequences for the parties. *See* Rule 12-312(D) NMRA (stating that an appellate court may take such action as it deems appropriate in response to failure to comply with the rules or any order of the court).

___ P.3d ___ (Nos. 30,926, 31,004, Nov. 4, 2013) (internal quotation marks and citation omitted). "However, it is fundamental that evidence must be adduced to support all issues of fact essential to the maintenance of an enforceable claim." *In re Estate of Kimble*, 1994-NMCA-028, ¶ 8, 117 N.M. 258, 871 P.2d 22 (citation omitted). "In reviewing whether a directed verdict was appropriate, we consider all evidence that has been properly admitted at trial, as well as all reasonable inferences deducible therefrom, resolving any conflicts or contradictions in the evidence in a light most favorable to the party resisting the motion." *McNeill*, 2003-NMCA-078, ¶ 31. "[T]he question is not whether literally no evidence exists to support the party against whom the motion is made, but whether evidence exists upon which a jury properly could return a verdict for that party." *Melnick v. State Farm Mut. Auto. Ins. Co.*, 1988-NMSC-012, ¶ 12, 106 N.M. 726, 749 P.2d 1105.

{5}    The district court entered a directed verdict on all of Hacienda's counterclaims, for violations of the UPA, fraud, and negligence. We address the district court's ruling as to each of these counts.

**UPA Claim**

{6}    In directing a verdict against Hacienda on its UPA counterclaim, the district court found that Hacienda "did not suffer any damages whatsoever with respect to any sort of practice that Mr. Kuckelman engaged in with respect to the salvaging of the wire or the pipe." "[T]here are three essential elements to a UPA claim. This includes:

5

(1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person." *Hicks v. Eller*, 2012-NMCA-061, ¶ 18, 280 P.3d 304 (internal quotation marks and citations omitted), *cert. denied*, 2012-NMCERT-005, 294 P.3d 445. "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 17, 112 N.M. 97, 811 P.2d 1308. "[T]he UPA does not require proof of actual monetary or property loss." *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 44, 142 N.M. 437, 166 P.3d 1091.

{7}     Hacienda does not contest that it was paid for the copper wire or that it can retrieve the pipe from Kuckelman's business premises. Therefore, we do not consider Hacienda's argument that it suffered any actual damages. Hacienda also contends, however, that there was sufficient evidence at trial to warrant a UPA claim for nominal damages on the issue of the value of the wire and pipe, as well as regarding the warranty of the pump. On appeal, Hacienda claims the following evidence

6

supports a finding that Kuckelman acted knowingly: (1) "Kuckelman frequently dealt in copper wire and pipe;" (2) "former employees testified that Kuckelman frequently sold copper wire and pipe taken from other customers' properties;" (3) "[Mr.] Kuckelman repeatedly represented that the copper wire and pipe were worthless, when they were not;" (4) "Kuckelman promised to deliver Hacienda's wire and pipe to the salvage yard, but then refused to deliver the pipe or return it;" (5) "Kuckelman had already instructed its truck driver to take the materials to the salvage yard *before* knowing that Hacienda intended to sell them;" and (6) "Kuckelman's co-owner[, Angie Gallegos,] did not deny the scam, but taunted Hacienda that it could not be proven." Hacienda also claims that Kuckelman promised to provide a five-year warranty for the motor, but failed to do so. Based on this evidence, we address whether a reasonable jury could have found that Kuckelman knowingly made false or misleading representations regarding the worth of the copper wire and pipe.

{8}     First, although Hacienda contends that Kuckelman "frequently dealt in copper wire and pipe[,]" this fact alone would not lead a jury to find that Kuckelman knowingly misrepresented the value of these materials.

{9}     Next, although Hacienda claims that "[a] former Kuckelman employee testified that it was Kuckelman's practice to charge its clients a fee to transport copper wire and pipe away, and then sell it for its own account[,]" Hacienda takes the evidence out of context to create an inference that cannot reasonably be drawn.

7

{10}     The actual testimony Hacienda cites to for support, from Kuckelman's former employee, Mr. Narvaez, is as follows:

Q.     Did you have a discussion of any sort with Mr. Kirschenbaum regarding the wire that was removed from the well?

A.     Yes. At the end of the job, naturally we clean up the job site area, and we suggested that he keep his wire and/or we would have to charge him for it and haul it away.

Q.     Why did you suggest he keep his wire?

A.     For some people it's salvage. Other people just have us haul it away. So basically it was up to him whether he wanted to save it for something or not.

. . .

Q.     In your experience, what normally happens to the wire that's taken off the site?

A.     We take it back to our yard and basically we dispose of it into half a pickup truck bed. All our wire would accumulate in that one bed. At the end of a month, or whatever it is, when it would accumulate[,] we'd get to the scrap yard, they would take it and recycle it.

Q.     Would Kuckelman be paid for the salvage of that wire?

A.     I'm sure he was.

Q.     Would he charge customers for removing wire from their property?

A.     Yeah. We charged them a removal fee of all materials, pressure tanks.

Although Hacienda's argument paints a nefarious picture regarding Kuckelman's business practices, the actual testimony provides only that Kuckleman would charge a removal fee and that its practice was to leave the decision regarding disposal of used materials to the customer. In other words, the customer—in this case Hacienda—would decide what it wanted to do with the salvage materials from the job site, and Kuckelman would haul the materials away if a customer did not want to keep them. Mr. Narvaez's testimony reinforces Mr. Kirschenbaum's own statement that the Kuckelman employee working on Hacienda's well asked Mr. Kirschenbaum what he wanted to do with the salvage materials. This evidence undercuts any inference that Kuckelman's practice was to take wire and pipe without permission and sell the materials for its own benefit, or that it did so in this case. Moreover, we conclude that Mr. Narvaez's testimony that Kuckelman sold its customers' salvage materials for profit was purely speculative, particularly since he provided no testimony as to how much money Kuckelman would receive for these materials or whether Kuckelman in fact kept that money. Mr. Narvaez's testimony therefore does not support that Kuckelman knew, much less understated, the value of its customers' scrap materials.

{11}     We note also that Mr. Kuckelman testified that when unwanted material, such as wire or pipe, is taken from a site, the wire is put in a trailer and occasionally scrappers come pick it up and pay "a few hundred dollars" for all of it and that the pipe is generally put in a pile because of its low value. This undisputed testimony

9

further forecloses Hacienda's inference that Kuckelman knew the value of the quantity and type of materials specifically taken from Hacienda's well as it appears Kuckelman did not generally distinguish the quantity or type of materials it salvaged from its other customers or how much money it actually received for each customer's salvage materials.

{12} Next, Hacienda claims that Kuckelman "told Hacienda that the copper wire and pipe were worthless, [when] they were actually worth $2,000 and $660 respectively." To violate the UPA, a misrepresentation of this nature would only occur if Kuckelman knew or should have known at the time he made the statements that the materials were worth something. *See Stevenson*, 1991-NMSC-051, ¶ 15 (noting that misrepresentation must be knowingly made for purposes of establishing UPA violation). This assertion—that the copper wire and pipe were worthless—by itself, does nothing to further Hacienda's argument that Kuckelman knew of the materials' value.

{13} Moreover, on the issue of knowledge, Kuckelman's expert, Mr. Vail, who owns a well service company, testified that he had never consulted with a salvage company about the value of copper wire removed from a well and that he was surprised to find out that the wire removed from Hacienda's well was worth over $2000, given the type of wire it was. This testimony belies any inference that the value of salvage materials was a matter of common knowledge in the well industry such that Kuckelman should

10

have known its value, or that other professionals in the industry had a practice of consulting with salvage companies to determine the value of discarded wire and pipe. Further, Mr. Vail testified that even if he had information regarding the value of copper wire, he would still not be asking his well service company to salvage copper wire from job sites. Mr. Vail testified that he still thinks the wire is "worthless" because the time and effort involved is not worth what he would get from salvage at the current rates. The evidence was also undisputed that the pipe from Hacienda's well was heavily corroded and could not be painted and that because it was galvanized, it could not be welded without giving off toxic fumes. This evidence fails to suggest, much less establish, that Kuckelman knew or should have known the value of the wire and pipe taken from Hacienda's well, particularly in its current condition.

{14}     Next, Hacienda alleges that "Kuckelman agreed to take Hacienda's pipe to a salvage yard, but failed to do so, and then refused to return the pipe to Hacienda or deliver it to the salvage yard." We note that Hacienda does not dispute that Kuckelman took the copper wire to a local salvage yard and that Hacienda was paid directly for it. In addition, the uncontested evidence established that Kuckelman took the pipe back to its business premises, where it remained at least until trial, and that Kuckelman offered to arrange for the pipe to be picked up and delivered to Hacienda. In light of this evidence, Hacienda's only complaint can be that Kuckelman did not deliver the pipe to the scrap yard or bring it back to Hacienda. However, Hacienda

11

does not cite to authority that imposes on Kuckelman any duty to deliver the pipe, and we decline to conclude that it was required to do so or that any such failure resulted in a violation of the UPA.

{15}    Hacienda also alleges that, "although Hacienda told Kuckelman not to take the materials, they were loaded on Kuckelman's truck the next day, and Kuckelman had instructed its driver to take the wire and pipe to Capital Salvage, apparently knowing that Kuckelman would be able to sell it and keep the profits." Hacienda further contends that this occurred before Kuckelman knew that Hacienda intended to sell the materials itself. However, Hacienda cites to nothing in the record that suggests that Kuckelman loaded the wire and pipe onto its truck "knowing" that it "would be able to sell it and keep the profits," or that it did so before it knew Hacienda wanted to sell the materials. To the contrary, the evidence supports an inference that Kuckelman loaded the wire and pipe onto its truck to deliver it to the salvage company at Hacienda's request the day Hacienda made clear that it wanted to sell the materials for salvage. Specifically, Kuckelman's principal testified that the day Hacienda informed Kuckelman that it intended to sell the copper wire and pipe, Kuckelman instructed its driver to load the materials onto Kuckelman's truck and take them to the salvage yard. There is no dispute that Kuckleman's driver took the coil of wire to the salvage yard and that Hacienda was paid for the wire. The evidence in this instance does not

support Hacienda's contention that there was sufficient evidence on its UPA claim to submit to the jury.

{16} Next, Hacienda contends that when its principal, Mr. Kirschenbaum, "confronted a co-owner of Kuckelman, Angie Gallegos, about the attempt to defraud him, she did not deny it, but brazenly asserted that he would never be able to prove what Kuckelman had done." Hacienda also claims that "Gallegos denied telling Hacienda that they would never be able to prove the fraud." As an initial matter, we note that this latter characterization misrepresents the record. Counsel never asked Gallegos at trial whether she made the comment, nor did she independently disclaim making it. Further, even assuming Gallegos made this comment, in light of the other evidence presented at trial, the comment does not, standing alone, form a sufficient basis upon which Hacienda could demonstrate that a reasonable jury could find in its favor. *See Melnick*, 1988-NMSC-012, ¶ 12 (noting that the salient question in a directed verdict determination "is not whether literally no evidence exists to support the party against whom the motion is made, but whether evidence exists upon which a jury properly could return a verdict for that party").

{17} Finally, Hacienda asserts that "Kuckelman also promised to provide a 5-year warranty for the motor, but provided instead a vague, self-contradictory warranty that is no more than an invitation to a lawsuit." However, evidence on whether Kuckelman failed to provide the warranty was presented to the jury, Hacienda argued the issue of

13

the warranty in closing, and an instruction on the warranty was submitted to the jury as a defense to Kuckelman's breach of contract claim. Because the jury awarded Kuckelman all of its requested damages on the breach of contract claim, it rejected Hacienda's warranty defense. We have no reason to believe that the jury would view the same evidence any differently if it were presented in the guise of a counterclaim. If there was any error related to the warranty claim, it was harmless. We conclude that the district court did not err in directing a verdict on Hacienda's UPA claim.

**Fraud**

{18} Hacienda also contends the district court erred in granting a directed verdict on its fraud counterclaim. The district court ruled in favor of Kuckelman on the fraud counterclaim because it found that Hacienda had not presented sufficient evidence to meet the clear and convincing standard of proof. The district court also found that, because Hacienda received payment for the wire that was taken to salvage and that Kuckelman offered to return the pipe it still has, there was not sufficient evidence to establish actual damages for any alleged fraud. Lastly, the district court found that there was no evidence of willfulness, wantonness, or intention on the part of Kuckelman and that, therefore, the claim for punitive damages stemming from the alleged fraud was to be dismissed. "A successful fraud claim must prove a misrepresentation of fact, known by the maker to be untrue, made with the intent to deceive and to induce the other party to act upon it, and upon which the other party

14

relies to his detriment." *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 1991-NMSC-097, ¶ 15, 113 N.M. 9, 820 P.2d 1323. Each element of fraud must be shown by clear and convincing evidence. *Id.* We recognize that nominal damages can support a fraud claim. *See Garcia v. Coffman*, 1997-NMCA-092, ¶ 36, 124 N.M. 12, 946 P.2d 216.

{19}     To support its contention that the district court erred in directing a verdict on its fraud counterclaim, Hacienda cites to the same evidence as it does for its UPA claim. We are not persuaded. First, because Hacienda was paid for the copper wire and has always been able to pick up the pipe and collect its salvage value, we note that Hacienda did not even incur nominal damages. Further, in light of our conclusion regarding Hacienda's UPA claim and because a fraud claim carries an additional legal element and a higher burden of proof than a UPA claim, the evidence to which Hacienda has cited could not lead a reasonable jury here to conclude that Kuckelman committed fraud. There also was not sufficient evidence presented to establish that Kuckelman acted willfully, wantonly, or intentionally, when, as we concluded above, there was not even sufficient evidence to demonstrate it acted knowingly. The district court did not err in granting a directed verdict on Hacienda's fraud counterclaim.

**Negligence**

{20}     Hacienda further argues that the district court erred when it directed a verdict on any counterclaim stemming from the work Kuckelman did for Hacienda in 1995

15

and that the district court erred insofar as its ruling encompassed any negligence counterclaim related to the work performed in 2009. "A negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Spencer v. Health Force, Inc.*, 2005-NMSC-002, ¶ 18, 137 N.M. 64, 107 P.3d 504 (alteration, internal quotation marks, and citation omitted).

{21} At the outset, we note that both parties have raised arguments regarding whether or not the 1995 negligence counterclaim was viable, and whether the issue had been properly preserved. We need not address these technical arguments because, even if we assume that the negligence counterclaim was properly brought by the correct party within the applicable limitations period, there is still not sufficient evidence such that a reasonable jury could have found in favor of Hacienda.

{22} Hacienda argues that the following evidence supports its 1995 negligence counterclaim: (1) the pump and motor were installed without cable guards/spiders, a torque arrestor, or a safety line; (2) Mr. Narvaez testified that Kuckelman has used torque arrestors on other wells; (3) there was a plastic bottle on the bottom of the pump when it was pulled from the well in 2009, which Hacienda claims was used as a makeshift torque arrestor, and that although Kuckelman testified he did not place it there, the jury could have inferred otherwise; (4) because Kuckelman installed a

16

torque arrestor in 2009, it was "implicitly conceding that [torque arrestors] are necessary"; (5) Mr. Narvaez testified that an improper kind of tape was used to secure the copper wire running down the pipe; (6) because Mr. Vail conceded that spiders are sometimes useful to secure wire in a completely different kind of well pump system, the jury could infer that they were necessary in Hacienda's well, even though Mr. Vail specifically testified that Hacienda's well would not warrant the use of spiders; and (7) the pump manufacturer recommends the use of a safety line.

{23} This evidence does not establish that a reasonable jury could have found in Hacienda's favor in relation to any negligence claims stemming from the 1995 work. Kuckelman's expert testified that all of the 1995 work on the well was conducted professionally and in accordance with the customs and standards in Santa Fe at the time. That testimony was undisputed at trial. The uncontroverted testimony also established that the average life of a well in New Mexico is ten years, and the fact that the well lasted fourteen years before it needed to be repaired alone could preclude a reasonable jury from finding that the 1995 work was negligently performed. The only evidence Hacienda cites to rebut this evidence is Mr. Kirschenbaum's testimony in which he stated that wells at two of his homes in New York have lasted longer than fourteen years. A lay person's personal observation about wells at his personal residences in New York is not the type of evidence that would lead a reasonable jury to find that a well pump installed in a ten-suite luxury hotel in New Mexico was

17

negligently installed. Furthermore, without any evidence to support that the use of a torque arrestor, spiders, or a security line would have extended the service life of the well, Hacienda's assertions regarding causation are mere conjecture. Indeed, both Mr. Kuckelman and Mr. Vail testified that torque arrestors, centering devices, and safety lines are unnecessary and not helpful for the kind of well at Hacienda. Simply put, there was no evidence that any defective work or materials from work performed in 1995 caused the well or equipment to malfunction or prematurely fail. The district court did not err in directing a verdict against Hacienda for any work Kuckelman performed in 1995. *See Melnick*, 1988-NMSC-012, ¶ 11 ("If the evidence fails to present or support an issue essential to the legal sufficiency of a . . . claim, the right to a jury trial disappears.").

{24} Hacienda further contends that, "[o]n the separate negligence counterclaim related to the 2009 pump installation, the only claim Hacienda is raising on appeal is that a directed verdict should not have been granted on Hacienda's claim that Kuckelman improperly removed and damaged the [copper wire]." However, at trial, Hacienda specifically raised the quality of the work performed in 2009 as one of its defenses to Kuckelman's breach of contract claim. Indeed, the jury was instructed on Hacienda's defense that Kuckelman's 2009 "work was deficient, thereby excusing payment." The jury was further instructed that "[t]o establish that [Kuckelman's] work

18

was deficient, [Hacienda] has the burden of proving that Kuckelman . . . materially failed to properly install the replacement pump, wire, pipe, or other materials."

{25} Hacienda argues that, although this instruction allowed the jury to consider whether the replacement materials were properly installed, it did not allow the jury to consider Hacienda's claim that the previously-existing copper wire was improperly *removed*. This argument hinges on a meaningless distinction. The evidence at trial established that the wire installed in 1995 was "either abraded over time, or when it was installed, or possibly when it was removed[.]" The jury still found for Kuckelman. To the extent the district court directed a verdict on any alleged negligence related to the 2009 work, that ruling was not in error.

**District Court's Order Denying Motion to Amend Scheduling Order Deadlines**

{26} Hacienda argues that the district court erred when it did not permit modification of the scheduling order so that Hacienda could designate an expert witness after the original deadline. Rule 1-016(B) NMRA states that a "scheduling order shall not be modified except by order of the court upon a showing of good cause." "We will not interfere with the [district] court's enforcement of pretrial deadlines. Adherence to such scheduling orders [is] critical in maintaining the integrity of judicial proceedings." *Reaves v. Bergsrud*, 1999-NMCA-075, ¶ 28, 127 N.M. 446, 982 P.2d 497 (alteration, internal quotation marks, and citation omitted). We review the district court's order denying Hacienda's motion to amend the deadlines in the scheduling

19

order for abuse of discretion. *See id.* ¶ 13. "An abuse of discretion occurs when the [district] court's ruling is against the facts, logic, and circumstances of the case or is untenable or unjustified by reason." *Id.*

{27}    We cannot say that the district court abused its discretion when it refused to amend the scheduling order deadlines to allow Hacienda to designate an expert witness. Hacienda filed its motion approximately fourteen months after it filed its counterclaims, nine months after the expert disclosure deadline established in the scheduling order, three months after the close of discovery, and two months after the original trial date. "[District] courts have inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Miller v. City of Albuquerque*, 1975-NMCA-099, ¶ 32, 88 N.M. 324, 540 P.2d 254. The district court's inherent power "embraces the ability of a court to control its docket and the proceedings before it[,]" *In re Jade G.*, 2001-NMCA-058, ¶ 27, 130 N.M. 687, 30 P.3d 376, and "to supervise and control the movement of all cases on its docket from the time of filing through final disposition[.]" *State v. Ahasteen*, 1998-NMCA-158, ¶ 28, 126 N.M. 238, 968 P.2d 328 (internal quotation marks and citation omitted), *abrogated on other grounds by State v. Savedra,* 2010-NMSC-025, 148 N.M. 301, 236 P.3d 20.

{28}    Here, the scheduling order's expert witness deadline required identification of defense expert witnesses, together with the expert's CV, a summary of the expert's

20

opinions, and any written reports prepared by the expert by a date certain. Hacienda's motion to amend the scheduling order only argued that, given the new trial date the district court had set, there was sufficient time for Hacienda to designate an expert and that it should be permitted to do so "should [it] choose[.]" Hacienda never identified any expert witness it intended to call and concedes it had not actually retained an expert witness by the time the district court heard its motion. Further, from the beginning of this case, or at the very least from the time it deposed Kuckelman's expert, Hacienda should have known—and in fact did know—that it needed to have an expert testify on its behalf to support the allegations in its counterclaim and to rebut the testimony of Kuckelman's expert. *See Reaves*, 1999-NMCA-075, ¶ 27 (stating that when the need for an expert was of no surprise to a party, there was no resulting unfairness to it).

{29}    We are not persuaded by Hacienda's suggestion that its former counsel negligently failed to timely disclose an expert witness and, therefore, "good cause" existed to allow amendment of the scheduling order. As Hacienda concedes, our courts have not yet defined "good cause" within the context of amending the scheduling order deadlines pursuant to Rule 1-016. However, its reliance on *DeFillippo v. Neil*, 2002-NMCA-085, 132 N.M. 529, 51 P.3d 1183, is unavailing. *DeFillippo* discussed "good cause" within the context of whether a defendant's excuses for failing to answer a complaint justified a district court's decision to set

aside an entry for default judgment. *Id.* ¶¶ 27-29. Although, in *DeFillippo*, we held that the district court "often should set aside an entry of default that is a result of a party's negligence[,]" *id.* ¶ 28, we decline to apply the rationale of that case here. To do so would essentially require that district courts be compelled to disregard the scheduling deadlines they set whenever a party claims its previous counsel has been negligent. Consequently, we hold that the district court did not abuse its discretion when it did not amend the scheduling order to allow Hacienda to designate an expert witness.

**District Court's Order Granting Kuckelman Its Attorney Fees Incurred in Connection With Defending Hacienda's Motion to Compel**

{30}    Hacienda argues that the district court erred in awarding Kuckelman its attorney fees incurred in connection with defending Hacienda's motion to compel and subsequent motion for reconsideration. We review a district court's decision to award discovery sanctions for an abuse of discretion. *See Lewis ex rel. Lewis v. Samson*, 2001-NMSC-035, ¶ 13, 131 N.M. 317, 35 P.3d 972. We also review a district court's award of attorney fees for abuse of discretion. *Rio Grande Sun v. Jemez Mountains Pub. Sch. Dist.*, 2012-NMCA-091, ¶ 10, 287 P.3d 318, *cert. denied*, 2012-NMCERT-008, 296 P.3d 490.

{31}    "The only exceptions to a mandatory award of expenses for failure to comply with a discovery order occur when the failure to comply was substantially justified or

22

if other circumstances make an award of expenses unjust." *Marchman v. NCNB Tex. Nat'l Bank*, 1995-NMSC-041, ¶ 54, 120 N.M. 74, 898 P.2d 709 (internal quotation marks and citation omitted); Rule 1-037(A)(4) NMRA ("If [a motion to compel] is denied, the court shall, after opportunity for hearing, require the moving party or the attorney advising the moving party or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust."). "An individual's discovery conduct may be considered substantially justified . . . if it is a response to a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Marchman*, 1995-NMSC-041, ¶ 54 (alteration, internal quotation marks, and citation omitted).

{32} Hacienda argues that its discovery conduct was substantially justified because, in seeking information regarding Kuckelman's past jobs, Hacienda was "asking to look at a source of information reasonably calculated to lead to the discovery of admissible evidence." The discovery at issue was a twenty-one part interrogatory seeking information about all of Kuckelman's jobs over a five-year period. Hacienda asserts this interrogatory sought information related to its fraud counterclaim because "if Kuckelman had given [credits for salvage value], or if Kuckelman's files showed profits from the sale of copper wire, this would have supported Hacienda's claim that

23

Kuckelman willfully attempted to defraud them by stating that the copper wire and pipe were worthless."

{33} Kuckelman objected to the interrogatory and, in response to a motion to compel, provided evidence that answering the interrogatory would require Kuckelman's office to review approximately seven thousand separate previous jobs and projects and compile and organize data from each of those files to answer the subparts, and that this endeavor would likely take approximately four hundred hours or more to review, a task for which Kuckelman did not have the staff or resources. In addition, Kuckelman presented evidence that, if it were to review all the files or compile the information and pay its attorneys to provide the requested information, the cost of doing so would be at least double or triple the amount in controversy.

{34} Based on this evidence, the district court ruled that (1) the interrogatory was burdensome, oppressive, and not designed to seek relevant or admissible information, (2) Kuckelman did not have adequate office staff to comply, (3) Kuckelman timely and properly objected to the interrogatory, (4) Kuckelman's objection was not general or boilerplate, and (5) the objection was supported by credible and admissible evidence establishing the burdensome and oppressive nature of the interrogatory. The district court also denied Hacienda's motion to reconsider its ruling.

{35} On appeal, Hacienda points to the fact that, during the hearing on its motion, its attorney stated that a business records production would be acceptable in lieu of

24

receiving an answer to the interrogatory. However, Hacienda never formally sought to narrow the scope of the discovery it requested by issuing an amended interrogatory, for example, to request specific information about Kuckelman's credits for salvage materials, to limit the request to jobs similar to the Hacienda project or to jobs in the general area with deep wells such as Hacienda's to the gauge or length of Hacienda's wire, or to what was quoted or received by Kuckelman for salvaging pipe or wire.

{36}     We are not persuaded by Hacienda's unfounded assertion that if the discovery requested was unduly burdensome, it was only because Kuckelman had "chosen to use a 19th-Century form of record-keeping," and that this cumbersome practice should not excuse Kuckelman from answering discovery. In light of the evidence presented below regarding the resources that the requested discovery would have drained in relation to the facts and amount in controversy of this dispute, we do not agree that the district court abused its discretion when it found that the discovery Hacienda sought was not substantially justified. We affirm the district court's award of attorney fees on the motion to compel.

**District Court's Order Granting Kuckelman Its Attorney Fees**

{37}     Hacienda further contends that the district court erred in awarding Kuckelman its attorney fees incurred in connection with the suit. To this end, the district court found that "[t]he attorney[] fees and calculations set forth in [Kuckelman's] attorneys' Affidavit filed on 3/30/2012, were reasonable in amounts, time and charges, and were

25

reasonably necessary." "Generally, we review an award of attorney fees for abuse of discretion." *Rio Grande Sun*, 2012-NMCA-091, ¶ 10. "Section 48-2-14 empowers the court to award reasonable attorney fees in the district and supreme courts in actions to enforce mechanics' and materialmen's liens." *Lenz v. Chalamidas (Lenz II)*, 1991-NMSC-099, ¶ 2, 113 N.M. 17, 821 P.2d 355 (emphasis omitted). While an award of attorney fees is discretionary, "the exercise of that discretion must be reasonable when measured against objective standards and criteria." *Lenz v. Chalamidas (Lenz I)*, 1989-NMSC-067, ¶ 19, 109 N.M. 113, 782 P.2d 85. "[T]he district court should determine the time reasonably necessary to provide the services required in a particular case, apply the remaining factors articulated in *Lenz I*, and ultimately arrive at a reasonable fee." *Lenz II*, 1991-NMSC-099, ¶ 3. The *Lenz I* factors are: "(1) the time and labor required—the novelty and difficulty of the questions involved and skill required; (2) the fee customarily charged in the locality for similar services; (3) the amount involved and the results obtained; (4) the time limitations imposed by the client or by the circumstances; and (5) the experience, reputation and ability of the lawyer or lawyers performing the services." *Lenz I*, 1989-NMSC-067, ¶ 19. "We have also stated that time spent and quality of representation are not always dispositive of the amount of attorney fees to be awarded in the successful enforcement of liens." *Id.* "For example, when the plaintiff has sued for a small sum clearly owed, then a higher percentage of the award may be reasonable as an attorney's fee." *Id.* "The

reasonableness of the fee must be closely scrutinized if the amount is based on the defense of counterclaims and other questions collateral to the enforcement of the lien." *Id.* ¶ 20.

**{38}** Hacienda does not argue that the amounts, time, and charges Kuckelman requested were unreasonable, and therefore seems to concede that the *Lenz I* factors were satisfied. Moreover, Hacienda does not appear to dispute that the fees Kuckelman incurred were reasonably necessary under the facts of the case and per the mandate of *Lenz II*. Rather, Hacienda relies on statements in *Hiatt v. Keil* that "the fee must be reasonable" and that "[a] fee in excess of 300% more than the judgment awarded is patently unreasonable." 1987-NMSC-049, ¶ 7, 106 N.M. 3, 738 P.2d 121. Hacienda concludes that this renders the district court's award of attorney fees worth 315% of the judgment unreasonable. However, since *Hiatt*, our Supreme Court has reiterated that the application of the factors in "Lenz I[] is not a rigid, mechanical process, and the weight accorded each factor will vary from case to case." *Lenz II*, 1991-NMSC-099, ¶ 2. Hacienda has not explained how the district court erred in assigning the weight it accorded to each factor, or which portion of the fee award resulted from work Kuckelman performed to defend the counterclaim. In addition, we observe that much of the fees Kuckelman incurred resulted from its need to respond to Hacienda's actions in the litigation, for example defending against Hacienda's motion to compel and corresponding motion for reconsideration, and responding to

27

Hacienda's counsel's withdrawal shortly before trial and the attendant delay in trying the case. Hacienda has cited to nothing that suggests Kuckelman's attorney engaged in any gratuitous litigation tactics or that otherwise rebuts the district court's conclusion that the attorney fees Kuckelman requested were reasonably necessary in the context of this particular lawsuit. Accordingly, the district court did not err in granting Kuckelman its attorney fees incurred in connection with the suit.

**District Court's Order Awarding 18% Prejudgment Interest**

{39}    In addition to Kuckelman's attorney fees, the district court also granted prejudgment interest based on Section 56-8-4. Hacienda argues this was improper. We agree. Section 56-8-4 applies only to postjudgment interest. *See* § 56-8-4(A)(1) ("Interest shall be allowed *on judgments and decrees* for the payment of money from entry and shall be calculated at the rate of eight and three-fourths percent per year, unless . . . the judgment is rendered on a written instrument having a different rate of interest, in which case interest shall be computed at a rate no higher than specified in the instrument[.]" (emphasis added)). To support its argument that the court properly granted interest based on Kuckelman's invoice, Kuckelman cites to *New Mexico Tire & Battery Co. v. Ole Tires, Inc.*, 1984-NMSC-063, 101 N.M. 357, 683 P.2d 39. However, nothing in that opinion suggests it applies to prejudgment interest. To the contrary, in that case, our Supreme Court held that "[t]he allowance of 18% on *a judgment* for [the prevailing party] would be proper because there is 'a written

instrument' having a different rate of interest than the 15% permitted by Section 56-8-4." *N.M. Tire & Battery*, 1984-NMSC-063, ¶ 18 (emphasis added). This characterization makes clear that *New Mexico Tire & Battery* was applying Section 56-8-4 to calculate postjudgment interest, not prejudgment interest. The proper statutory provision under which to calculate prejudgment interest for money due by contract is NMSA 1978, Section 56-8-3 (1983). *See* § 56-8-3(A) ("The rate of interest, in the absence of a written contract fixing a different rate, shall be not more than fifteen percent annually . . . on money due by contract."). Accordingly, we remand to the district court for a determination of the appropriate amount of prejudgment interest to be awarded to Kuckelman, pursuant to the mandates of Section 56-8-3.

**Award of Attorney Fees for This Appeal**

{40}     Finally, Kuckelman has requested that we grant it the attorney fees it has incurred in defending this appeal. As we noted above, a "prevailing party in a dispute arising out of or relating to a lien action is entitled to recover from the other party the reasonable attorney fees, costs and expenses incurred by the prevailing party." Section 48-2-14. Because this dispute has resulted in an appeal and because Kuckelman is the prevailing party, we grant its request for its attorney fees on appeal and remand to the district court for a determination as to their proper amount.

**CONCLUSION**

29

{41} We affirm on the first four issues discussed in this memorandum opinion, reverse as to the amount of prejudgment interest, and remand to the district court for a determination of the amount of prejudgment interest and the amount of attorney fees to be awarded to Kuckelman for this appeal.

{42} **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**M. MONICA ZAMORA, Judge**